JAMES R. HUMMER, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Hummer v. Commissioner
Docket No. 16491-87.
United States Tax Court
T.C. Memo 1988-528; 1988 Tax Ct. Memo LEXIS 556; 56 T.C.M. (CCH) 657; T.C.M. (RIA) 88528; November 14, 1988. Bruce A. Hochstetler, for the petitioner.
Steve R. Johnson, for the respondent. PARKER
MEMORANDUM FINDINGS OF FACT AND OPINION
PARKER, Judge: Respondent determined deficiencies in petitioner's Federal income tax for taxable years 1982, 1983, and 1984, in the amounts of $ 7,322, $ 7,044, and $ 7,868, respectively. In addition, respondent determined an addition to tax for 1984 of $ 393 under section 6653(a)(1) and 50 percent of the interest due on $ 7,868 *558 under section 6653(a)(2). [1] The issues for decision are:
(1) Whether petitioner had his tax home in Angola and was a bona fide resident of Angola for purposes of the section 911 foreign earned income exclusion for 1982, 1983, and 1984; and
(2) Whether petitioner is liable for the additions to tax provided by section 6653(a)(1) and (a)(2) for 1984.
FINDINGS OF FACT
Some of the facts have been stipulated, and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference.
Petitioner, James R. Hummer, is a high school graduate and completed a four-year apprenticeship as a plumber. He has no training in tax or accounting and has no familiarity with tax rules and regulations. During 1982 and 1983, while in the United States, petitioner stayed at 14500 S.W. 280th Street, Homestead, Florida. That address was a three-bedroom, double-wide mobile home originally owned by his mother and later owned and occupied *559 by his sister and her husband. Petitioner had his own bedroom and kept his clothes there. During 1984, while in the United States, petitioner stayed at 916 Tracy Drive, Daytona Beach, Florida, which was the residence of Linda Hummer, his former wife, and their daughter, Beatrice Hummer.
In the years at issue, 1982, 1983, and 1984, petitioner was employed by Panelfab International, a corporation having its principal place of business in North Miami, Florida. Petitioner heard about the job through a newspaper ad in the Miami Herald. During the job interview he learned little about the job conditions other than that the job was in Angola and there was a work rotation of 42 days in Angola and 28 days outside Angola. Panelfab, pursuant to a contract with Cabinda Gulf Oil Company, provided qualified personnel to work at an oil drilling site in Malongo, Angola. Petitioner worked as a plumber at this site in Angola and was employed by Panelfab from March 21, 1981 until February 9, 1987.
Petitioner's work schedule in Angola consisted of six weeks (42 days) on duty and four weeks (28 days) off duty. Upon completion of his 42-day work period, petitioner returned to the United States *560 via Luanda, Angola airport for a rest period of 28 days. While the Angolan Government required petitioner to leave Angola after each 42-day work period, neither his employer nor the Angolan Government required that he return to the United States and spend his rest period in the United States. Petitioner could spend his rest period any place in the world outside of Angola, but petitioner always returned to the United States for his rest period. In 1982 and 1983 petitioner returned to the Homestead, Florida residence. In 1984, he returned to the home of Linda Hummer in Daytona Beach, Florida.
At the conclusion of the 28-day rest period, petitioner left Florida for Luanda, Angola. Each time he arrived at Luanda, he was required to surrender his United States passport to the Angolan Government until he again departed for the next rest period. Petitioner was first issued a United States passport in 1981, and he was issued a new United States passport in 1985. Petitioner's air travel within Angola and between Angola and the United States was arranged and paid for by Panelfab.
While in Angola, petitioner was required to stay in a compound at the Malongo site maintained for some 300 *561 foreign workers from the United States, United Kingdom, West Germany, and Canada. Panelfab provided him a mobile home rent free, and also provided free meals, laundry services, and medical services. Petitioner had few possessions at the compound. Petitioner did not own an automobile in Angola. He had the use of a vehicle owned by his employer, which he was allowed to operate only within the confines of the compound.
Throughout the time petitioner worked in Angola, the country was in a state of civil war. Extensive security measures were in effect in and around the foreign workers' compound. The compound was ringed by security fences, barricades, and a mine field. The compound was heavily guarded by Cuban and Angolan troops, who, along with tanks and artillery, were stationed immediately adjacent to the compound. Angolan naval gunboats patrolled the waterfront areas at and around the compound. A boat was kept moored at all times at the compound's dock on the Atlantic Ocean, with deck cleared and ready to depart in the event the compound had to be evacuated as a result of military attack. Petitioner was not permitted by the Angolan Government to leave the compound or to travel *562 within Angola except to: (1) travel to and from the Luanda airport; (2) travel under military escort to Malongo; and (3) go under escort to the work site located within one or two miles of the compound.
Petitioner's family members could not visit him or live with him in the compound. In addition, petitioner was not visited at the compound by anyone not also staying in the compound. A few Angolan natives worked around the compound, serving, for example, as hands on the fishing boat that petitioner and the other foreign workers occasionally used.
Petitioner worked from 6:00 a.m. to 6:00 p.m. six days a week and from 6:00 a.m. to noon on Sundays. Consequently, he had little free time to socialize even at the compound. In his free time he usually played softball at the compound, went out on the boat to fish, or rested at the compound. For a brief period in 1984 he worked on a hangar job in Cabinda, away from the oil drilling site, and on Sunday afternoons after work he occasionally stopped on his way back to the compound to have a drink or listen to music with some Angolan natives who were co-workers on that hangar project. The official language of Angola is Portuguese, and petitioner *563 learned only a little of the language and "not the best words" at that. However, he had little opportunity or need to learn Portuguese.
Petitioner did not have a bank account or credit card accounts in Angola. He did not have any local currency or have any need for any. Further, petitioner did not belong to any local Angolan organizations or engage in social activities with Angolan citizens. He did not participate in the economic life of Angola except through his work. Petitioner had little or no contact or interaction with the communal life of Angola, his only real contact with Angolan citizens being primarily at the work site.
As a condition of employment by Panelfab, petitioner was required to keep an address in the United States. In compliance with this requirement, petitioner kept an address during 1982 and 1983 at the Homestead, Florida residence of his sister and her husband. During 1984, petitioner stayed at the Tracy Street address in Daytona Beach, Florida, which was the residence of Linda Hummer and their daughter, Beatrice Hummer. During the years before the Court, petitioner returned directly to these residences during each of his 28-day rest periods. In 1983 *564 petitioner purchased a car. He kept his car and his clothes at the two Florida addresses. Petitioner had a driver's license issued by the State of Florida on December 18, 1981, and renewed in December 1985. Petitioner's mail was delivered to him at the two Florida addresses. In 1985 he purchased a house in Florida and registered to vote in Florida. He thereafter voted absentee when in Angola on election days. Petitioner at all times material to this case had VISA an MasterCard accounts in the United States showing his Florida addresses as well as bank accounts in Florida showing his Florida addresses only.
In 1982 and 1983, during the periods petitioner was in the United States, a room was provided for him at the Homestead address and was used by him habitually. Petitioner gave his sister money to defray rent and utilities expenses. In 1984, petitioner lived with and in December of that year remarried Linda Hummer, and that year he provided funds to defray expenses at her Daytona Beach residence. While in the United States, during all three years, petitioner spent his time fishing, relaxing, visiting his daughter, and visiting other relatives and friends.
Petitioner did *565 not own any furniture or television set in either Angola or the United States. In the United States he owned an automobile and his personal belongings; in Angola he owned his hand tools, a radio, and a rod and reel. When he quit his job and left Angola for the last time in February 1987, he left behind the radio and the rod and reel. Petitioner quit his job in Angola because he was tired of the travel involved in the 42-day/28-day rotations. He would have left Angola in 1982 if the job had ended then. At all times he would have preferred to work in the United States or in a country closer to the United States such as Canada or Mexico, if he could have gotten a comparable job there.
As a result of his employment with Panelfab, petitioner was present in Angola 225 days in 1982, 221 days in 1983, and 210 days in 1984. On his Federal income tax return for 1982, petitioner claimed a foreign earned income exclusion in the amount of $ 46,500, equal to 62 percent of his total salary of $ 75,000 (225 days divided by 365 total days equals 61.6 percent). For 1983 petitioner claimed a foreign earned income exclusion in the amount of $ 48,400, equal to 60.5 percent of his total salary of *566 $ 80,000 (221 days divided by 365 total days equals 60.5 percent). For 1984 petitioner claimed a foreign earned income exclusion in the amount of $ 45,904, equal to 57.38 percent of his total salary of $ 80,000 (210 days divided by 365 total days equals 57.53 percent). In all three years petitioner claimed the foreign income exclusion on the basis of physical presence.
For all three years, the Acadiana Bookkeeping Service in Lafayette, Louisiana prepared petitioner's tax returns. Petitioner had no information or knowledge as to the experience of qualifications of the person or persons who prepared his returns. He obtained the name of Acadiana from co-workers in Angola who told him they were getting the foreign earned income exclusion. Acadiana prepared an amended 1981 return for petitioner, which for the first time claimed the foreign earned income exclusion. While respondent initiated an audit of his 1981 return, petitioner never had an opportunity to meet with any representative of the Internal Revenue Service, and the Service in 1984 issued a "no change" letter for 1981. Petitioner spoke with Acadiana representatives by telephone once a year. Petitioner signed his return. *567 On his 1984 Federal income tax return, petitioner claimed "single" filing status. However, petitioner had remarried Linda Hummer on December 21, 1984. The parties agree that petitioner erred in claiming "single" filing status, and that his proper filing status for 1984 was "married filing separately." IRS instructions accompanying the Form 1040 state that if a person is married on December 31, he should consider himself married for the entire year.
OPINION
The issue is whether petitioner is entitled to the section 911 foreign earned income exclusion for the income he earned in Angola. That depends on whether he satisfies the requirements to be a "qualified individual" under either section 911(d)(1)(A) or (d)(1)(B). A "qualified individual" is one who has a "tax home" in a foreign country and who is "(A) a citizen of the United States, and establishes to the satisfaction of the Secretary that he has been a bona fide resident of a foreign country for an uninterrupted period which includes and entire taxable year" (bona fide residence test), or "(B) a citizen or resident of the United States *568 and who, during any period of 12 consecutive months, is physically present, in a foreign country * * * during at least 330 full days in such period" (physical presence test). Secs. 911(d)(1)(A) and (B). Petitioner concedes he does not qualify under the physical presence test. Thus, to be entitled to the foreign earned income exclusion, petitioner first must have his "tax home" in the foreign country.
The term "tax home" is specifically defined for this purpose by section 911(d)(3) as follows:
(3) Tax Home. -- The term "tax home" means, with respect to any individual, such individual's home for purposes of section 162(a)(2) (relating to traveling expenses while away from home). An individual shall not be treated as having a tax home in a foreign country for any period for which his abode is within theUnited States. [Emphasis supplied.]
The regulations under section 911 also define "tax home" as follows:
[A]n individual's tax home is considered to be located at his regular or *569 principal (if more than one regular) place of business or, if the individual has no regular or principal place of business because of the nature of the business, then at his regular place of "abode" in a real and substantial sense. An individual shall not, however, be considered to have a tax home in a foreign country for any period for which the individual's abode is in the United States.[Emphasis supplied.] Sec. 1.911-2(b), Income Tax Regs.
Therefore, if petitioner has an abode in the United States, he does not have a tax home in a foreign country and thus cannot be a "qualified individual" for purposes of section 911. This Court has defined "abode" in terms of the individual's economic, familial and personal ties. Lemay v. Commissioner,T.C. Memo. 1987-256, affd. 837 F.2d 681, 682 (5th Cir. 1988).
The Fifth Circuit in Lemay v. Commissioner, supra, has approved the Tax Court's definition of the term "abode" as follows:
An examination of circuit precedent reveals no cases interpreting the definition *570 of "tax home" within the context of section 911 as it relates to the limiting "abode" language. However, in Bujol v. Commissioner, the tax court, addressing virtually identical facts to those in the instant case, held that the taxpayer's "abode" remained at his residence in Louisiana. The Bujol court concluded that the plain meaning of the term "abode" required such a result, stating:
'Abode' has been variously defined as one's home, habitation, residence, domicile or place of dwelling. Black's Law Dictionary 7 (5th ed. 1979). While an exact definition of 'abode' depends upon the context in which the word is used, it clearly does not mean one's principal place of business. Thus, 'abode' has a domestic rather than vocational meaning, and stands in contrast to 'tax home' as defined for purposes of section 162(a)(2).
Id. at 763-64 (footnote omitted). The Bujol court reasoned that the taxpayer's economic, familial, and personal ties to Louisiana, and his lack of contact with the foreign country dictated a conclusion that the taxpayer's "abode" remained in the United States. Id. *571 * * *
In sum, we believe that the tax court's interpretation and application of section 911 in the instant case is consistent with the plain language of the Code and regulations thereunder. * * * [837 F.2d at 683-684.]
Our Bujol case has also been affirmed by the Fifth Circuit. Bujol v. Commissioner,T.C. Memo. 1987-230, affd. without published opinion 842 F.2d 328 (5th Cir. 19988).
In this case, the facts in regard to petitioner's economic, familial, and personal ties to Florida are substantially similar to those in Lemay and Bujol. Upon completion of petitioner's 42-day work period, he was required to leave Angola by the Angolan Government. Petitioner always returned to the United States after each successive 42-day work period, although neither the Angolan Government nor his employer required him to return to the United States. Since petitioner returned to the United States each time, approximately 40 percent of his time in each of the years was spent in the United States. Petitioner's family members could not visit him or live with him in the compound in Angola. His mother, sister, brother-in-law, daughter *572 and ex-wife (later again his wife) were in Florida. Petitioner maintained a residence and an automobile in Florida, a Florida driver's license, Florida bank accounts, and United States credit card accounts. He later purchased a home in Florida and registered to vote in Florida.
In contrast, petitioner's contacts with Angola were limited. Although petitioner contends that he attempted to integrate himself within the Angolan community, the facts are otherwise. He received his mail in the United States. He was paid in the United States in U.S. currency, and he did not have or need any local Angolan currency. He did not belong to any local Angolan organizations, did not participate in the economic life of Angola except through his job, learned little Portuguese, the official language of Angola, and had little opportunity or need to learn it. His social interaction with Angolan citizens was principally at the work site. Based on the record as a whole, petitioner had few contacts with Angola and at the same time had strong economic, familial, and personal ties to Florida.
In conclusion, we find petitioner's "abode" remained in the United States in 1982, 1983, and 1984. Since petitioner's *573 abode was in the United States, he did not have "tax home" in Angola within the meaning of section 911. Angola was nothing more than his place of business. Since petitioner failed to meet the first requirement of section 911(d) of establishing a "tax home" in a foreign country, we need not discuss the additional statutory requirements necessary to be considered a "qualified individual." Therefore, petitioner is not entitled to the foreign earned income exclusion under section 911.
The final issue in this case is whether petitioner is liable for additions to tax under sections 6653(a)(1) and (a)(2) for negligence or intentional disregard of rules and regulations.
Section 6653(a)(1) provides for an addition to tax if any part of any underpayment is due to negligence or intentional disregard of rules and regulations. The taxpayer has the burden of proof. Marcello v. Commissioner,380 F.2d 499, 507 (5th Cir. 1967), affg. a Memorandum Opinion of this Court; Estate of Mason v. Commissioner,64 T.C. 651, 663 (1975), affd. 566 F.2d 2 (6th Cir. 1977); *574 Enoch v. Commissioner.57 T.C. 781, 802-803 (1972). Negligence is defined as the lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Neely v. Commissioner,85 T.C. 934, 947 (1985); Marcello v. Commissioner, supra,380 F.2d at 506.
In this case we conclude that part of petitioner's underpayment of tax for 1984, the year in which he was married, was due to negligence or intentional disregard of rules and regulations. Petitioner filed his 1984 return on a "single" basis, although he was married at the close of 1984, a fact he knew. Petitioner testified that he did not think his marriage was legal until the marriage was recorded in early 1985. This testimony, coming from a man of petitioner's years and worldly experience, was wholly unbelievable. Moreover, the instructions to the Form 1040 inform taxpayers that if they are married on the last day of the taxable year, they are treated for Federal tax purposes as married for the entire year. Petitioner was aware of that fact. Thus, we sustain the section 6653(a)(1) addition.
*575 Section 6653(a)(2) provides an addition equal to 50 percent of the interest payable under section 6601 with respect to the portion of the underpayment attributable to the negligence or intentional disregard of rules and regulations. Hence, we must determine the portion of the underpayment that is attributable to negligence or intentional disregard of rules and regulations. That portion attributable to petitioner's filing status clearly is. However, as to the remaining portion of the underpayment that is attributable to petitioner's erroneous claim of a section 911 foreign earned income exclusion, we reach a different conclusion.
Some fourteen cases have recently been decided by this Court on the foreign earned income exclusion, most of which involved taxpayers working on oil rigs located off various foreign shores, but two of which actually involved other taxpayers working at the Malongo site in Angola. [2] However, at the time petitioner filed his 1984 return in 19985, the law was still sufficiently unsettled and uncertain that petitioner, a lay person with no particular tax background or knowledge, cannot be said to have been negligent *576 or to have intentionally disregarded rules and regulations in claiming the section 911 exclusion. [3]
*577 We are aware that petitioner on his 1984 return claimed the exclusion on the basis of physical presence in Angola when he knew or should have known that he had not been in the foreign country for the required 330 days of the year. We find it troubling that petitioner and a number of his co-workers on the Malongo site used a return preparer who made these improper claims regardless of the fact that under the 42-day/28-day rotation plan these workers were on, they could not have been in Angola for 330 days in any one year. However, petitioner had received in 1984 a "no change" letter from the Internal Revenue Service in connection with his amended return for 1981 on which he for the first time claimed the foreign earned income exclusion. Also petitioner attached to each of his returns a list of the days he was actually in Angola, so respondent could not have been misled by his claim on the basis of physical presence. Moreover, there was at least an arguable legal position which could be and was advanced here (see n.3, supra). Accordingly, we conclude that the portion of the underpayment attributable to the foreign earned income exclusion is not subject to the addition under *578 section 6653(a)(2).
To reflect the concessions and the above holdings,
Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable years in question, and all "Rule" references are to the Tax Court Rules of Practice and Procedure.↩
2. Welsh v. Commissioner,T.C. Memo. 1988-512; Cameron v. Commissioner,T.C. Memo. 1988-496; Brobst v. Commissioner,T.C. Memo 1988-456 [Angola]; Steel v. Commissioner,T.C. Memo. 1988-399; Whitesell v. Commissioner,T.C. Memo. 1988-398; Miller v. Commissioner,T.C. Memo 1988-397; Howe v. Commissioner,T.C. Memo. 1988-277; James v. Commissioner,T.C. Memo. 1988-266 [Angola]; Bassett v. Commissioner,T.C. Memo. 1988-218; Richard v. Commissioner,T.C. Memo 1988-217; Lemay v. Commissioner,T.C. Memo. 1987-256, affd. 837 F.2d 681 (5th Cir. 1988); Sparks v. Commissioner,T.C. Memo. 1987-244; Bujol v. Commissioner,T.C. Memo. 1987-230, affd. without published opinion 842 F.2d 328 (5th Cir. 1988); Darden v. Commissioner,T.C. Memo 1987-174↩. 3. We note that although the present case was tried after the Fifth Circuit had affirmed this Court's Lemay opinion, petitioner's counsel vigorously urged that that case was wrongly decided by this Court and the Fifth Circuit, prompting from respondent a 56-page opening brief and 35-page reply brief. We do not agree with the arguments of petitioner's counsel that we and the Fifth Circuit have somehow confused the concepts of "abode," "domicile," and residence." We also regard his further argument for a "substantial presence test" as an attempt to get around the 330-day physical presence requirement of section 911(d)(1)(B) and to disregard the over-arching "tax home" requirement of both section 911(d)(1)(A) and section 911(d)(1)(B). Section 911 expressly adds the "abode" limitation to the usual definition of "tax home." Sec. 911(d)(3)↩. Thus, while we do not see fit to change our position, the arguments advanced by petitioner's counsel cannot be considered frivolous or groundless, and petitioner cannot be held to have been negligent or to have intentionally disregarded rules and regulations in advancing such arguments.