JAMES R. MOUDY, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Moudy v. Commissioner
Docket Nos. 35260-85; 1633-87.
United States Tax Court
T.C. Memo 1989-216; 1989 Tax Ct. Memo LEXIS 216; 57 T.C.M. (CCH) 327; T.C.M. (RIA) 89216; May 4, 1989; As corrected May 9, 1989 James R. Moudy, pro se. Frank Simmons, and J. Craig Young, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined deficiencies in petitioner's income tax for the calendar years 1982 and 1983 in the amounts of $ 14,176 and $ 19,821, *218 respectively and an addition to tax under section 6651(a)(1) [1] for the year 1983 in the amount of $ 149.70. Certain issues have been disposed of by agreement of the parties leaving for our decision whether petitioner, James R. Moudy (petitioner), was a "qualified individual," within the meaning of section 911(d), entitled to elect to exclude from gross income, under section 911(a), a portion of the wages he earned while working in Nigeria in 1982 and 1983. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioner's legal residence was in Hattiesburg, Mississippi at the time of the filing of the petitions in these cases. Petitioner filed his Federal income tax returns for the calendar years 1982 and 1983 with the Internal Revenue Service Center in Philadelphia, Pennsylvania. Petitioner was born and grew up in Hattiesburg, Mississippi. He has lived there his entire life except for work-related absences and two or three years he spent *219 in Louisiana. Petitioner's parents have also lived in Hattiesburg their entire lives. Two of petitioner's siblings live in the Hattiesburg area as do a number of his friends and other relatives. During 1982 and 1983, petitioner maintained bank accounts in Hattiesburg and had a Mississippi driver's license. Petitioner has been married twice. Petitioner's first wife died prior to 1982 and petitioner remarried on August 12, 1983. Petitioner had three children by his first wife. These children were approximately four, six, and eight years old during 1982. During 1982 and 1983, the years here at issue, and for several years prior thereto, petitioner worked for Hughes Tool Company (Hughes). In 1981, while petitioner was working for Hughes, primarily as an operator on an oil rig in the Gulf of Mexico, he was approached by a manager about the possibility of taking a position overseas in Nigeria. Because such a position would involve a promotion to supervisor, would entail a raise in pay, and would provide substantial bonuses for overseas work, petitioner elected to accept an overseas position in Nigeria. Between October 1981 and December 1983, petitioner worked in Nigeria as *220 a drilling supervisor for Hughes and its partner company in Nigeria, Alea Company, Ltd. (Alea). Petitioner was assigned to a 28/28 work schedule. Under this schedule he worked for a 28-day period and then was allowed a 28-day rest period. [2] Because of his duties as a supervisor, petitioner was not able to follow this schedule strictly. Petitioner lived and worked primarily in a compound in Izombe, Nigeria during each 28-day work period. Hughes provided all of petitioner's food and lodging at no cost to him when he was at the Izombe compound. Petitioner's work also required that he travel to Alea's headquarters in Lagos, Nigeria every two weeks. When petitioner was in Lagos, he stayed without cost to him at a hotel or at Alea's staff house. In addition, petitioner was required to drive or fly to other parts of Nigeria on occasion in connection with his work. When petitioner traveled on company business, Hughes paid all his food and lodging expenses. On occasion, *221 when petitioner was ahead in his work, he would play golf or go sailing. In addition, if his duties permitted, petitioner would occasionally, during his 28-day work periods, take a few days off and visit friends that he had made in the oil industry. Some of these friends were Nigerian and some were American, Italian, or German. When visiting these friends, petitioner would stay at their houses or a hotel. However, petitioner never stayed at the house of a Nigerian. Hughes did not pay petitioner's expenses when he traveled for personal reasons. Petitioner would also, on occasion, travel and visit friends in Nigeria for a few days during his 28-day rest period. Petitioner was not required by Hughes or the Nigerian government to leave Nigeria during his 28-day rest period. Petitioner was the legal guardian of his children and was often required to return to the United States to make decisions on their behalf in connection with the wrongful death action brought as a result of the death of his first wife. However, petitioner would have returned to the United States to visit his children even if his presence was not required in connection with the wrongful death action. During *222 the years at issue, petitioner returned to the United States at some point during every 28-day rest period. Petitioner arrived in, and departed from, the United States on the following dates: Arrived in United States
Departed from United States
-
November 22, 1981
December 26, 1981
January 27, 1982
March 9, 1982
March 28, 1982
May 1, 1982
May 19, 1982
June 26, 1982
July 15, 1982
August 21, 1982
September 9, 1982
October 16, 1982
November 2, 1982
December 11, 1982
December 26, 1982
January 28, 1983
February 26, 1983
March 30, 1983
April 23, 1983
May 26, 1983
June 17, 1983
July 28, 1983
August 13, 1983
September 15, 1983
September 25, 1983
November 20, 1983
Petitioner spent, on average, approximately 19.5 days of each 28-day rest period with his family in Hattiesburg, Mississippi. However, due to his unpredictable schedule, petitioner spent as few as 10 days in the United States during one rest period and as many as 32 days in the United States during another. Hughes paid petitioner's round-trip air fare between the United States and Nigeria. Petitioner was not physically present in Nigeria for at least 330 full days during *223 any period of 12 consecutive months that began or ended during the taxable years 1982 or 1983. Up until May 1982, petitioner's children lived at his parents' house in Hattiesburg, Mississippi. When petitioner returned to the United States during his rest periods, he also lived with his parents. In May 1982, a house petitioner was having constructed for himself and his children was completed. The house was located at 105 Chesterfield Road in Hattiesburg. Petitioner and his children moved into the new house in May 1982 and from that date until petitioner's remarriage, a housekeeper took care of petitioner's children. When petitioner returned to the United States during his rest periods, he stayed with his children in the new residence. After petitioner's remarriage on August 12, 1983, his wife cared for the children while petitioner was in Nigeria. Petitioner had the option of bringing his children, and later his second wife, with him to Nigeria but chose not to do so because of the country's unstable political situation. While in Nigeria, petitioner received personal correspondence from his second wife and children, but all other mail (i.e., monthly bills) were sent to him *224 in Hattiesburg. In order to live and work in Nigeria, non-citizens are required by the Nigerian government to obtain a "residency permit" and pay Nigerian income taxes. Petitioner obtained a residency permit from the Nigerian government. He was then required to obtain an "aliens card" from the province in which the headquarters of Alea was located. The residency permit together with the aliens card allowed petitioner to stay in the Province of Lagos, Nigeria for a period of two years. The residency permit also allowed him to travel temporarily to other provinces within Nigeria. Along with the residency permit, petitioner was issued a "multiple re-entry visa" which allowed him to leave and re-enter Nigeria at his or his employer's convenience, without obtaining a visa for each entry. After obtaining the requisite residency permit and aliens card, petitioner obtained a "work permit" which allowed him to work in the Province of Lagos, Nigeria, the location of Alea's headquarters. Petitioner's employer, Hughes, paid an unspecified amount of income taxes to the Nigerian government on petitioner's behalf in 1982 and 1983. Even though petitioner was required by Nigerian law to obtain *225 a residency permit, he could not own property in Nigeria under Nigerian law. Petitioner had certain personal belongings (i.e., work clothes, shoes, etc.) which he kept in his room at the Izombe compound. Petitioner obtained a Nigerian driver's license. He also opened a checking account with the Commerce Bank of Africa in Owerri, Nigeria. However, he did not write checks on the account and used it only to exchange currency. In December of 1983, Hughes ceased operations in Nigeria. All of Hughes' employees, including petitioner, left Nigeria at about this time. Some Americans remained behind and continued to work for other companies in Nigeria. The reigning government in Nigeria was overthrown shortly after petitioner left. Petitioner worked for Hughes until November 1984. During the remainder of his tenure with Hughes, he worked in Texas, Alaska, and Louisiana. He returned to Nigeria to work for a different company in 1986. Petitioner received wages from Hughes in 1982 in the amount of $ 56,890.50. Hughes withheld approximately $ 15,972 in U.S. Federal income taxes from petitioner's wages pursuant to section 3402. On his return for the calendar year 1982, petitioner excluded *226 $ 48,525 of his total wages from gross income under section 911(a)(1) as foreign earned income. He computed his tax liability based on the tax rates applicable to a head of household. Petitioner reported his 1982 tax liability to be zero and claimed a refund of all amounts withheld from his wages. Petitioner received wages from Hughes in 1983 in the amount of $ 78,898.28. Hughes withheld $ 18,021 in U.S. Federal income taxes from his wages pursuant to section 3402. Petitioner's 1983 income tax return was received by the Internal Revenue Service Center at Philadelphia on May 1, 1984. On his return for the calendar year 1983, petitioner excluded $ 48,877 of total wages from his gross income under section 911(a)(1) as foreign earned income. He computed his tax liability based on the tax rates applicable to married persons filing separate returns and claimed entitlement to a refund of $ 16,827. In his notice of deficiency for petitioner's 1982 tax year, issued on August 2, 1985, respondent determined that petitioner was not entitled to exclude any portion of his 1982 wages under section 911(a)(1) and that petitioner owed U.S. Federal income taxes in the amount of $ 14,176. In *227 his notice of deficiency for petitioner's 1983 tax year, issued on October 21, 1986, respondent determined that petitioner was not entitled to exclude any portion of his 1983 wages under section 911(a)(1) and that petitioner owed U.S. Federal income taxes in the amount of $ 19,821. Respondent also determined that petitioner was liable for an addition to tax under section 6651(a), in the amount of $ 149.70, for failure to timely file his 1983 return. OPINION Section 911(a) provides, in part, that "At the election of a qualified individual * * *, there shall be excluded from the gross income of such individual, and exempt from taxation under this subtitle, for any taxable year * * * the foreign earned income of such individual * * *." Section 911(b)(1) defines the term "foreign earned income" as amounts received by an individual from sources within a foreign country which constitute earned income attributable to services performed by such individual "during the period described in subparagraph (A) or (B) of subsection (d)(1), whichever is applicable." Section 911(d)(1), which defines the term "qualified individual," provides that: (1) * * * The term "qualified individual" means *228 an individual whose tax home is in a foreign country and who is -- (A) a citizen of the United States and establishes to the satisfaction of the Secretary that he has been a bona fide resident of a foreign country or countries for an uninterrupted period which includes an entire taxable year, or (B) a citizen or resident of the United States and who, during any period of 12 consecutive months, is present in a foreign country or countries during at least 330 full days in such period. The parties agree that petitioner was not physically present in any foreign country or countries for 330 full days during a consecutive 12-month period which began or ended in 1982 or 1983. Thus, in order for petitioner to be considered a qualified individual, entitled to take advantage of the exclusion provided by section 911(a), he must show that his tax home was in Nigeria during the years at issue and that he was a bona fide resident of Nigeria for an uninterrupted period which includes an entire taxable year. Because we conclude that petitioner's tax home was not in Nigeria during the years at issue, we need not reach the question of petitioner's bona fide residency. Section 911(d)(3) provides *229 that, for purposes of section 911, a taxpayer's "tax home" is his home for purposes of section 162(a)(2) (relating to traveling expenses while away from home). However, this section further provides that "An individual shall not be treated as having a tax home in a foreign country for any period for which his abode is within the United States." Section 911(d)(3); section 1.911-2(b), Income Tax Regs.; Lemay v. Commissioner,837 F.2d 681 (5th Cir. 1988), affg. a Memorandum Opinion of this Court. Therefore, even if petitioner's home for purposes of section 162(a)(2) was in Nigeria during the years at issue, he will not be treated as having a "tax home" in Nigeria (and will not be entitled to take advantage of the foreign earned income exclusion under section 911(a)) if, for the years at issue, his "abode" was in the United States. In Lemay v. Commissioner, supra, the taxpayer was an oil rig worker on an offshore rig in the territorial waters of Tunisia. The taxpayer worked a 28/28 schedule. Although the taxpayer spent most of his 28-day work period on the offshore rig, he was occasionally required, because of his supervisory position, to travel *230 to his employer's main offices on the Tunisian mainland. While on the mainland, the taxpayer stayed in a hotel room or apartment provided by his employer. The taxpayer had minimal contact with Tunisian residents but did meet some Tunisian officials and occasionally attended informal gatherings or sporting events. The taxpayer's employer paid virtually all of his living expenses and provided him with round-trip air fare between Tunisia and the United States. The taxpayer returned to his home and family in Lake Charles, Louisiana during each 28-day rest period. The taxpayer maintained a residence in Lake Charles, was registered to vote in Lake Charles, maintained a bank account in Lake Charles, and possessed a Louisiana driver's license. In determining whether the taxpayer, in Lemay v. Commissioner, supra, had an abode in the United States during the year at issue, the Fifth Circuit applied the following language, taken from our opinion in Bujol v. Commissioner,T.C. Memo. 1987-230, 53 T.C.M. 762, at 763-764, 56 P-H Memo T.C. par. 87,230 at 1112-87, affd. without published opinion 842 F.2d 328 (5th Cir. 1988): "Abode" has been variously *231 defined as one's home, habitation, residence, domicile, or place of dwelling. Black's Law Dictionary 7 (5th ed. 1979). While an exact definition of "abode" depends upon the context in which the word is used, it clearly does not mean one's principal place of business. Thus, "abode" has a domestic rather than vocational meaning, and stands in contrast to "tax home" as defined for purposes of section 162(a)(2) [Fn. ref. omitted.] Lemay v. Commissioner, supra at 683. Based upon the above language and its own examination of the facts, the court upheld our conclusion that the taxpayer retained strong economic, familial, and personal ties to his residence in Louisiana. In contrast, his ties to Tunisia were merely transitory. The court concluded that, since the taxpayer's abode remained in the United States during the year at issue, his tax home was not in Tunisia under section 911(d)(3). Therefore, he did not qualify for the foreign earned income exclusion under section 911(a). The facts of the instant case are, in many ways, similar to those present in Lemay v. Commissioner, supra. The most significant of these similarities are that: (1) Petitioner's *232 children, and later his second wife, continued to live in Hattiesburg, Mississippi even after petitioner left for Nigeria; (2) Petitioner returned to his home and family during each 28-day rest period even though he was not required to do so by Hughes or the Nigerian government; [3] (3) Petitioner maintained a home for himself and his family, initially at the house of his parents and later at his own house; and (4) Petitioner maintained bank accounts in Hattiesburg, Mississippi. All of petitioner's bills were sent to his mailing addresses in Hattiesburg, rather than his address in Nigeria. Petitioner's parents and many of his friends lived in Hattiesburg as did two of his siblings. Here, as in the Lemay case, petitioner did more than merely maintain a dwelling in Hattiesburg. He retained strong economic, familial, and personal ties with the United States. Furthermore, as was the case in Lemay v. Commissioner, supra, petitioner's ties to the foreign country in which he worked were merely transitory. *233 There are minor factual distinctions between this case and the Lemay case. The taxpayer in Lemay v. Commissioner, supra, maintained his own home in the United States during the entire year at issue. In the instant case, petitioner did not maintain a separate home from that of his parents in the United States for the first four months of 1982. During this period, his children lived with his parents and he stayed at his parents' home when he was in Mississippi. However, we do not consider this factor significant. The term "abode" does not carry with it an implication of exclusiveness requiring the taxpayer to maintain a separate and distinct house. Rather, the term "abode" refers to the taxpayer's home, habitation, residence, domicile or place of dwelling. Therefore, as long as petitioner and his children resided with his parents in a permanent sense during the first four months of 1982, as opposed to merely visiting them, the fact that he and his family did not live in a separate house does not negate a finding that petitioner's abode was within the United States during all of 1982. The instant case is also factually distinguishable from the Lemay *234 case in that petitioner was assigned to an oil rig and compound on the mainland of Nigeria while the taxpayer in the Lemay case was assigned to an offshore rig. Petitioner's assignment to the mainland of Nigeria could have caused him to be less isolated than the taxpayer in the Lemay case. However, petitioner's land-based assignment was, in many ways, similar to an assignment on an offshore rig in that his contacts with foreign citizens were extremely limited. [4] Petitioner remained in the compound at Izombe during his work period except for occasional excursions on company or personal business. When he did travel, he stayed at his employer's staff house, at hotels, or at the homes of his American, Italian, or German friends who were also in the oil industry. He never stayed at the home of a Nigerian friend because the living conditions were somewhat primitive. Petitioner remained significantly isolated from the mainstream of Nigerian life and did not develop personal ties to Nigerians outside the industry. Petitioner had a checking account with a Nigerian *235 bank, while, in Lemay v. Commissioner, supra, the facts do not show whether the taxpayer maintained a foreign bank account. However, petitioner testified that he opened the checking account solely to exchange currency. He never wrote any checks on the account. Petitioner had very limited, if any, economic ties with Nigeria. In the instant case, petitioner had a Nigerian driver's license, while, in Lemay v. Commissioner, supra, the facts do not show that the taxpayer had a Tunisian driver's license. In our view, possession of a driver's license, in itself, is not a significant permanent tie to a foreign country. Such a license is often needed merely to carry out a taxpayer's work-related duties.[5] In any event, petitioner also maintained a Mississippi driver's license and, therefore, any probative value that possession of a Nigerian driver's license might have is canceled out. [6]
In the instant case, petitioner was required by the Nigerian government to obtain a residency permit, *236 aliens card, and work permit, while in Lemay v. Commissioner, supra, the facts do not show that there was such a requirement. Petitioner testified at trial that the only reason he obtained the permits was to be entitled to work within the borders of Nigeria. Petitioner also testified that he was approached by Hughes about taking a position overseas (with the attendant promotion, raise in pay, and bonuses) and, when he indicated his interest, Nigeria just happened to be the place to which he was assigned. From the record, it appears that petitioner never had any long-term intention to stay in Nigeria as a resident. Petitioner could have brought his wife and children with him to Nigeria but never did so, thereby assuring his eventual return to the United States. Thus, petitioner had no permanent familial ties to Nigeria. Petitioner's decision in this matter indicates that any ties petitioner did have with Nigeria were merely transitory in nature and that petitioner intended to and did maintain strong economic, familial, and personal ties to the United States. In sum, after examining the record in the instant case, we conclude that petitioner maintained an abode *237 within the United States during 1982 and 1983 and, therefore, under section 911(d)(3), his tax home was not in Nigeria. Thus, petitioner is not a qualified individual within the meaning of section 911(d)(1) and is not entitled to exclude any portion of his wages from Hughes under section 911(a). Decisions will be entered for the respondent.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. While assigned to an oil rig in the Gulf of Mexico, petitioner worked a "can to can't" schedule, which means, "You go out there and stay as long as you can; when you can't stand it anymore, you come in."↩
3. Although petitioner testified that he was often required to return home in connection with the wrongful death action of his first wife, petitioner's testimony shows that he would have returned home in any event to be with his children and, later, his second wife.↩
4. Brobst v. Commissioner,T.C. Memo. 1988-456↩, appeal filed (10th Cir., Dec. 19, 1988).
5. Brobst v. Commissioner, supra.↩
6. Welsh v. Commissioner,T.C. Memo. 1988-512↩, appeal filed (10th Cir., Jan. 27, 1989).