T.C. Memo. 2014-60

UNITED STATES TAX COURT

AMAD ZAKER ERAM, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 16524-12.                    Filed April 7, 2014.

Amad Zaker Eram, pro se.

<u>Kathleen A. Tagni</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

VASQUEZ, <u>Judge</u>:  Respondent determined a deficiency of $21,095 in

petitioner's Federal income tax for 2009 and an accuracy-related penalty of

$4,219.  After concessions,[1] the issues remaining for decision are:  (1) whether

---

[1] Petitioner conceded $3,950 of charitable contributions and $41,365 of miscellaneous itemized deductions.  While petitioner did not address the accuracy-
(continued...)

**[*2]** petitioner was a qualified individual whose abode was outside the United States during the relevant period between June 2008 and June 2009 for purposes of claiming an exclusion of foreign earned income under section 911(a) for 2009, and (2) whether petitioner is liable for an accuracy-related penalty under section 6662(a) for 2009.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated herein by this reference. Petitioner resided in California at the time he filed the petition.

## I.    Petitioner's Background

Petitioner was born in Iraq in 1959. He grew up speaking Arabic and studied English while in school. In 1978, at the age of 19, he moved to the United States and settled in San Diego, California, with his first wife. They had one child together. Petitioner has two brothers, both of whom moved to the United States

---

[1] (...continued)
related penalty in his petition, we find that it was tried by consent. See Rule 41(b). Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

**[*3]** sometime thereafter.  Petitioner obtained a California driver's license soon after arriving in the United States and was naturalized as a U.S. citizen in 1985.

During 1986 and 1987 petitioner made two trips to visit his parents in Iraq. In 1989, after the Iran-Iraq War had ended, petitioner's parents left Iraq and joined him and his brothers in the United States.  Petitioner and his family stayed in touch with friends and family who remained in Iraq.  They did not return to Iraq-- initially out of fear of the Hussein regime's brutality, and later to avoid the violence in the country after Hussein was deposed--but they did hope to eventually return there.

Petitioner and his first wife divorced in 1986, and he married his second wife in 1987.  He and his second wife had three children together before divorcing in 1998.  Following the divorce his second wife retained primary custody of their three children, and his contact with his children was greatly reduced.

In 2000 petitioner married his third wife.  He and his third wife did not have any children together.  They separated at the beginning of 2008, and they divorced sometime in 2009.

II.    Petitioner's Foreign Work Experience

In 2004 petitioner began working in Virginia under a contract with the Defense Intelligence Agency (DIA).  As part of this job he obtained a Government

**[*4]** security clearance from the DIA. Sometime during the year an opening for a post in Iraq became available, and petitioner volunteered. One of his brothers, Edward Anton, was already working for the United States in Iraq, and petitioner hoped to do the same. However, petitioner's employer assigned him to a post in Qatar instead. He worked on a U.S. military base in Qatar for approximately 14 months.

Petitioner's deployment ended at the beginning of 2006, but he did not immediately return to the United States. He instead traveled to Mexicali, a town in Mexico just across the border from the United States, and about 120 miles east of San Diego. He stayed in Mexicali for approximately six months. Then, in mid-2006, he got a new job in San Diego and returned to the United States.

III.   Employment With Torres

Torres Advanced Enterprise Solutions, LLC (TAES), is a defense contractor based in Virginia. TAES primarily provides security and linguistic services through contracts with the U.S. Department of State and the U.S. Department of Defense. In 2007 or 2008 TAES entered into a contract with the U.S. Department of State to provide translation services in Iraq. The contract period originally ended on April 17, 2009, but was subsequently extended through April 17, 2011.

**[*5]** TAES hired petitioner to work as an Arabic/English linguist under the contract beginning in February 2008. He was paid an annual salary of $182,000.

Petitioner first left the United States for Iraq on February 26, 2008. The U.S. Department of State issued him a letter of authorization (LOA), which is a travel document that shows where the holder is permitted to travel to in a foreign country and what Government services he or she may access there. His original LOA permitted him to work in Iraq until February 9, 2009, but his authorization was subsequently renewed two more times. His final LOA permitted him to work in Iraq until March 22, 2010.

Petitioner was stationed in the International Zone, known colloquially as the "IZ" or the "Green Zone" (Green Zone). The Green Zone was a large section of Baghdad that was designated a safe area for U.S. Government contractors, Federal employees, and military personnel. In 2008, when petitioner first arrived in the Green Zone, the area was under the jurisdiction of the U.S. military. Control was handed over to the Iraqi Government on January 1, 2009.

Security was tight in the Green Zone. The entrances were guarded, and authorization was required to enter or exit. Nevertheless, some businesses were open inside the Green Zone, and apartments were available for rent.

**[*6]**   Petitioner's duties involved going out of the Green Zone on missions as part of a Provisional Reconstruction Team stationed in Baghdad.  The team's purpose was to help in rebuilding fire stations in Baghdad.  Petitioner served as an interpreter for his team and also as a cultural adviser.  In this capacity he had numerous encounters with local Iraqis on his missions.  When petitioner was not on a mission, he stayed inside the Green Zone.

When petitioner first arrived in Iraq in early 2008, he lived on a U.S. military base inside the Green Zone.  In 2009, after control of the Green Zone was transferred to the Iraqi Government, TAES moved its employees out of the military base and into a large house also inside the Green Zone.  TAES had purchased the house in order to provide housing for its employees.  TAES had crews to clean and maintain the house, and employees were provided with meals inside the house, although petitioner would occasionally buy his own food.  However, less than a month after petitioner had moved into the building, the Iraqi Government forced TAES and its employees to vacate the house.  Petitioner and his coworkers were relocated to a group of trailers on a nearby piece of property, which is where petitioner lived until he left Iraq.

As a U.S. Department of State contractor, petitioner had access to an APO-- an address box with a U.S. ZIP Code which he could use to receive mail in Iraq.

**[*7]** He used this address to receive packages with items he needed, such as boots and pants. Otherwise, he used the address of his parents' home in El Cajon,[2] California, to receive mail. In addition to using the El Cajon address as his "mail drop", he and his third wife reported that address as their residence on their joint Federal income tax return for 2008, although they had already separated. He did not maintain a home in the United States during the relevant period.

The U.S. Department of State contract also provided petitioner with access to some limited financial services, such as check cashing. However, because his bank in the United States provided him with online services, he was able to manage all of his financial affairs using only his U.S. bank account.

Petitioner was provided with ground transportation when required, and he did not own a vehicle in Iraq or obtain an Iraqi driver's license. He did, however, have a vehicle registered under his name in the United States, which one of his sons used while petitioner was in Iraq.

TAES also provided petitioner with vacation time and a $2,000 travel allowance. He accrued two days of vacation each month for a total of 24 days each year. He was permitted to use vacation time starting at the end of his first six months working in Iraq, and then every six months thereafter. He took a vacation

---

[2] El Cajon is a suburb of San Diego.

**[*8]** in August 2008 and again in February 2009. On both occasions he traveled to San Diego and visited his family. His family living in the United States was prohibited from visiting him in Iraq.

During his off-hours, petitioner had time to interact with his coworkers, including his brother Edward Anton. Some of his coworkers were local Iraqis. He was also able to see his father's brother who still lived in Iraq outside the Green Zone with his family. On multiple occasions his uncle and family came to visit him inside the Green Zone, although petitioner was unable to go to his uncle's home because of security restrictions. When his uncle and family came to visit, petitioner escorted them to and from the gate of the Green Zone.

In May 2009 petitioner sent an email to Rita Nisan, a human resources generalist working for TAES, stating that he needed to return to San Diego to look after his children. He was particularly concerned about one of his sons who he had learned was struggling with personal issues and needed his father's help. He hoped that TAES could switch him to a contract under which he could work alternating months on and off duty. TAES did not do so, and his employment with the company ended on June 4, 2009.

In April 2009, two months before his return to the United States, petitioner helped his son, Antonio, to purchase a house in Chula Vista, California (Chula

[*9] Vista house).[3] Legal title to the Chula Vista house was in Antonio's name. Nevertheless, when petitioner returned to the United States, he moved into the Chula Vista house and reported it as his address on his tax return for 2009.

IV.    Tax Return Preparation

Petitioner timely filed Form 1040, U.S. Individual Income Tax Return, for 2009 (2009 return). On his 2009 return, he claimed a deduction for charitable contributions of $3,950 and miscellaneous itemized deductions totaling $41,365.[4] He also claimed a foreign earned income exclusion of $38,571 on Form 2555, Foreign Earned Income.

Respondent began examining petitioner's 2009 return on or around October 18, 2011. On September 5, 2012, petitioner prepared a Form 1040X, Amended U.S. Individual Income Tax Return, for 2008 and a Form 1040X for 2009 (amended returns). On his amended returns petitioner claimed that he was exempt from all Federal income tax for those years under section 112 because he was working in a qualified combat zone. Respondent did not issue refunds for these claims.

_____

[3] Chula Vista is a suburb of San Diego.

[4] Petitioner conceded these deductions at trial. See supra note 1.

**[*10]**                                    OPINION

## I.     Burden of Proof

As a general rule, the Commissioner's determinations in a notice of deficiency are presumed correct, and the taxpayer bears the burden of proving that those determinations are erroneous. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). There are exceptions to this rule. Section 7491(a) shifts the burden of proof to the Commissioner as to any factual issue relevant to a taxpayer's liability for tax if the taxpayer meets certain preliminary conditions. This case is decided on the preponderance of the evidence and is not affected by section 7491(a).

## II.    Gross Income in General

Section 61(a) provides that gross income means all income from whatever source derived. Thus, citizens of the United States generally are taxed on income earned outside the United States unless the income is specifically excluded. Specking v. Commissioner, 117 T.C. 95, 101-102 (2001), aff'd sub nom. Haessly v. Commissioner, 68 Fed. Appx. 44 (9th Cir. 2003), and aff'd sub nom. Umbach v. Commissioner, 357 F.3d 1108 (10th Cir. 2003). Exclusions from income are construed narrowly, and taxpayers must bring themselves within the clear scope of the exclusion. Id.

[*11] III.    Section 911

Section 911(a) provides in part that a qualified individual may elect to exclude from gross income his or her foreign earned income. Section 911(b)(2)(D) limits the amount of foreign earned income that may be excluded. In 2009 the maximum amount of foreign earned income that could be excluded was $91,400. Sec. 911(b)(2)(D)(ii); Rev. Proc. 2008-66, sec. 3.28, 2008-2 C.B. (Vol. 2) 1107, 1113. Section 911(b)(1)(A) defines "foreign earned income" to mean, in general, "the amount received by * * * [an] individual from sources within a foreign country or countries which constitute earned income attributable to services performed by such individual" during the period set forth in section 911(d)(1). Section 911(b)(1)(B) excludes from foreign earned income certain amounts not relevant to this case.

Section 911(d)(1) defines the term "qualified individual" for purposes of section 911 to mean:

an individual whose tax home is in a foreign country and who is--

(A) a citizen of the United States and establishes to the satisfaction of the Secretary that he has been a bona fide resident of a foreign country or countries for an uninterrupted period which includes an entire taxable year, or

(B) a citizen or resident of the United States and who, during any period of 12 consecutive months, is present in a

**[\*12]** foreign country or countries during at least 330 full days in
such period.

Thus, a taxpayer must both (1) maintain a tax home in a foreign country and (2) either (a) establish a bona fide residency for an entire taxable year or (b) be present in a foreign country during at least 330 full days in a 12-month period.

As to the second requirement, respondent does not dispute that petitioner was present in Iraq for at least 330 days during the 12-month period ending on the day he left Iraq (the relevant period), and concedes that he meets the physical presence test. See sec. 911(d)(1)(B). Consequently, the validity of petitioner's claim for the section 911 exclusion rests on whether his tax home was in a foreign country during the relevant period between June 2008 and June 2009.

Section 911(d)(3) defines the term "tax home" as an individual's home for purposes of section 162(a)(2) (relating to travel expenses while away from home). Section 162(a)(2) provides for a deduction for ordinary and necessary expenses paid during the taxable year in carrying on a trade or business, including travel expenses incurred while away from home in the pursuit of a trade or business. See also Commissioner v. Flowers, 326 U.S. 465, 470-472 (1946). For purposes of section 162(a)(2), an individual's tax home is "the vicinity of the taxpayer's principal place of employment and not where his or her personal residence is

**[\*13]** located." <u>Mitchell v. Commissioner</u>, 74 T.C. 578, 581 (1980); <u>see also</u> Rev. Rul. 75-432, 1975-2 C.B. 60. If an individual is engaged in a trade or business at more than one location during the tax year, the individual's tax home is at his or her regular place of business or, if the individual has more than one regular place of business, at his or her principal place of business. <u>See</u> sec. 1.911-2(b), Income Tax Regs. If an individual has no regular or principal place of business because of the nature of the business, then the individual's tax home is his or her place of abode in a real and substantial sense. <u>Id.</u>

An individual, however, shall not be treated as having a tax home in a foreign country for any period during which his or her abode is within the United States. Sec. 911(d)(3); <u>see also</u> <u>Harrington v. Commissioner</u>, 93 T.C. 297, 307 (1989). Temporary presence of the individual in the United States does not necessarily mean that the individual's abode is in the United States. Sec. 1.911-2(b), Income Tax Regs. Petitioner's principal place of employment during the relevant period was in Iraq. Therefore, whether his tax home is in Iraq rests on whether his abode was in the United States during the relevant period. Neither section 911 nor the regulations thereunder define "abode". Thus we turn to our caselaw.

**[\*14]** In prior section 911 cases, we have examined and contrasted a taxpayer's domestic ties (i.e., his or her familial, economic, and personal ties to the United States) with his or her ties to the foreign country in which he or she claims a tax home in order to determine whether his or her abode was in the United States during a particular period.  See Harrington v. Commissioner, 93 T.C. at 307-308; see also Daly v. Commissioner, T.C. Memo. 2013-147; Struck v. Commissioner, T.C. Memo. 2007-42, 2007 Tax Ct. Memo LEXIS 42; Moudy v. Commissioner, T.C. Memo. 1989-216, 1989 Tax Ct. Memo LEXIS 216; Benham v. Commissioner, T.C. Memo. 1989-215; Bosarge v. Commissioner, T.C. Memo. 1989-15; Hummer v. Commissioner, T.C. Memo. 1988-528, 1988 Tax Ct. Memo LEXIS 556; Lemay v. Commissioner, T.C. Memo. 1987-256, aff'd, 837 F.2d 681 (5th Cir. 1988); Bujol v. Commissioner, T.C. Memo. 1987-230, 1987 Tax Ct. Memo LEXIS 234, aff'd without published opinion, 842 F.2d 328 (5th Cir. 1988). Even though a taxpayer may have some limited ties to a foreign country during a particular period, if the taxpayer's ties to the United States remain strong, we have held that his or her abode remained in the United States, especially when his or her ties to the foreign country were transitory or limited during that period. Harrington v. Commissioner, 93 T.C. at 308.

**[*15]** In <u>Struck v. Commissioner</u>, Tax Ct. Memo LEXIS 42, at *2, the taxpayers were employed by an automotive company to operate a yacht. <u>Id.</u> The yacht sailed primarily in foreign waters, and the taxpayers lived and worked aboard the vessel, even when docked at foreign ports. <u>Id.</u> Their living expenses were paid by the automotive company. <u>Id.</u> They were given two weeks of vacation each year, and their compensation included travel expenses to return to the United States. <u>Id.</u> While they spent most of the year outside the United States, they did own undeveloped land and a townhouse in the United States that they rented out. <u>Id.</u> at *4. They did not stay at the townhouse when they visited the United States on their vacations, but would sometimes camp on the undeveloped land. <u>Id.</u> In addition to the real property, they owned two vehicles, which they garaged at a relative's property, and maintained California bank accounts as well as California driver's licenses. <u>Id.</u> at *5.

We held that the taxpayers had met the requirements of section 911. <u>Id.</u> at *13, *16. As to the tax home requirement, we found that the taxpayers, whose business was to sail in foreign and international waters, were itinerants, and consequently had a foreign tax home.[5] <u>Id.</u> at *10-*11. As to abode, we examined

---

[5] "If in a year a taxpayer has neither a regular or principal place of business nor any abode in a real and substantial sense, a taxpayer may be classified as an

(continued...)

[*16] the ties the taxpayers had to the United States, and found that the taxpayers had only limited domestic ties during the period at issue. Id. at *13. Because the taxpayers also met the physical presence test under section 911(d)(1)(B), id. at *16, we found that they qualified for the foreign earned income exclusion, id. at *20.

Recently we considered a section 911 case involving a Government contractor who had worked in both Afghanistan and Iraq. See Daly v. Commissioner, T.C. Memo. 2013-147. In Daly, the taxpayer husband worked under his employer's contract with the Department of Defense. Id. at *3. While deployed, the taxpayer husband lived and worked on U.S. military bases. Id. at *4. The taxpayer husband was not permitted to leave the bases, nor was his family permitted to live with him on the bases. Id. Instead his wife remained in their home in Utah, where she ran a lobbying business. Id. at *5. During the years in issue the taxpayer husband also worked in his employer's offices in Utah between his deployments. Id. at *4.

---

[5] (...continued)
itinerant whose tax home is located wherever the taxpayer is physically located from day to day." Struck v. Commissioner, T.C. Memo. 2007-42, 2007 Tax Ct. Memo LEXIS 42, at *10 (citing Deamer v. Commissioner, 752 F.2d 337, 339 (8th Cir. 1985), aff'g T.C. Memo. 1984-63, Hicks v. Commissioner, 47 T.C. 71, 73 (1966), and Rev. Rul. 73-529, 1973-2 C.B. 37).

**[*17]** We found that the taxpayer husband's ties to Iraq and Afghanistan were "severely limited and transitory" during the period at issue, while his ties to Utah remained strong. Id. at *12. Consequently we found that, during the period at issue, the taxpayer husband's abode was in the United States, his tax home was in the United States, and he was not eligible for the foreign earned income exclusion.

## IV.    Parties' Arguments

Petitioner argues that, in the years leading up to the relevant period, he had severed most of his ties to the United States, and that his ties to the United States remained limited throughout the relevant period. He also argues that his ties to Iraq during the relevant period were strong, especially in the light of his background as a native Iraqi.

Respondent argues that petitioner's ties to the United States were strong during the relevant period and, on brief, emphasizes the strength of petitioner's ties to his family in the United States. Respondent also argues that petitioner's ties to Iraq were limited and transitory during the relevant period.

In Daly, and other section 911 cases where we found that the taxpayer's abode remained in the United States, we took note of the strong domestic familial ties that the taxpayers maintained during the period. See, e.g., Harrington v. Commissioner, 93 T.C. at 309; Daly v. Commissioner, at *12; Moudy v.

**[*18]** <u>Commissioner</u>, 1989 Tax Ct. Memo LEXIS 216, at *21-*22; <u>Bujol v.</u>

<u>Commissioner</u>, 1987 Tax Ct. Memo LEXIS 234, at *9-*10. In this case,

petitioner's credible testimony shows that his ties to his family in the United States

were limited during the relevant period.

At the beginning of 2008, when petitioner first left for Iraq, he had divorced

his first two wives, rarely saw his children, and was separated from his third wife.

During the relevant period, petitioner's contact with his family in the United States

was minimal, and he saw his family only during his two vacations. Moreover,

petitioner's ties to his family in the United States had weakened several years

before the relevant period, in the light of petitioner's decision in 2006 to follow up

14 months working in Qatar by spending 6 months in the Mexican border town of

Mexicali, rather than returning to see his family in San Diego.

Petitioner's testimony demonstrates that his domestic familial ties during

the relevant period were limited. Respondent has presented some evidence of

petitioner's other domestic ties, including petitioner's U.S. bank account, driver's

license, vehicle, and purchase of the Chula Vista house for his son. However, in

the light of petitioner's testimony about his familial ties, his lack of a home in the

United States during the relevant period, and the other evidence in the record, we

[*19] find that these other ties are not enough to support a finding that petitioner's ties to the United States were strong during the relevant period.[6]

Petitioner also credibly testified as to his strong ties to Iraq during the relevant period. He is a native of Iraq, a native speaker of Iraqi Arabic, and familiar with Iraqi culture. Moreover, he has deep ties to Iraq including family who still live there, as well as friends with whom he and his family have stayed in touch long after emigrating. Petitioner also credibly testified that he had many interactions with local Iraqis during the relevant period and saw his uncle and his uncle's family on multiple occasions. We thus find this case to be different from other section 911 cases where the taxpayers' foreign ties were limited and transitory. See, e.g., Harrington v. Commissioner, 93 T.C. 297; Daly v. Commissioner, T.C. Memo. 2013-147; Moudy v. Commissioner, T.C. Memo. 1989-216; Bujol v. Commissioner, T.C. Memo. 1987-230.

Respondent argues that petitioner was confined to the Green Zone when not on missions and prohibited from having any foreign contacts. Consequently, respondent argues that petitioner's living situation was similar to the taxpayer

---

[6] We note, however, that petitioner's domestic familial ties were renewed when his son's sudden and urgent need for help prompted petitioner to return to the United States. We find that these familial ties were reestablished only at the end of the relevant period and do not change the outcome.

[*20] husband's situation in <u>Daly</u>. We disagree. Petitioner has introduced credible evidence that he had strong ties to Iraq during the relevant period, and respondent has not persuaded us otherwise.

Considering all the facts and circumstances, we find that during the relevant period between June 2008 and June 2009, petitioner's ties to Iraq were strong while his ties to the United States were limited. Accordingly, we find that petitioner's abode was not in the United States. Therefore, petitioner's tax home was in Iraq, petitioner is a qualified individual for purposes of section 911(d)(1), and petitioner is entitled to the foreign earned income exclusion for 2009.

## V. Additional Arguments

In addition to the above arguments, respondent argues in the alternative that petitioner is not entitled to the section 911 exclusion because his stay in Iraq was temporary and, therefore, his tax home was not in Iraq.[7] <u>See</u> <u>Peurifoy v. Commissioner</u>, 358 U.S. 59, 60 (1958). Petitioner worked in Iraq subject to a

---

[7] Petitioner also raised an alternative argument. He appears to argue that he is also eligible under sec. 112 for the exclusion of income earned while serving in a combat zone. However, he was not a member of the Armed Forces of the United States during 2008 or 2009 and is not eligible for the exclusion. <u>See</u> secs. 112(a), 7701(a)(15); <u>see also</u> <u>Land v. Commissioner</u>, 61 T.C. 675 (1974) (a pilot employed by a private airline flying civilian aircraft under contract with the Department of Defense in support of the U.S. military in a combat zone during the Vietnam War was not a member of the Armed Forces and therefore not entitled to the sec. 112 exclusion).

**[*21]** contract with a specific end date. However, that contract was extended on more than one occasion, and during the relevant period, petitioner intended to stay in Iraq indefinitely with the expectation that the contract would continue to be extended. This is illustrated by the three LOAs issued to him, which had successively later end dates. We find that, during the relevant period, petitioner's stay in Iraq was not temporary, and his tax home was in Iraq.

VI.    Penalty

Pursuant to section 6662(a) and (b)(1) and (2), a taxpayer may be liable for a penalty of 20% of the portion of an underpayment of tax due to: (1) negligence or disregard of rules or regulations or (2) a substantial understatement of income tax. "Negligence" is defined as any failure to make a reasonable attempt to comply with the provisions of the Internal Revenue Code; this includes a failure to keep adequate books and records or to substantiate items properly. Sec. 6662(c); sec. 1.6662-3(b)(1), Income Tax Regs. "Disregard" means any careless, reckless, or intentional disregard. Sec. 6662(c). "Understatement" means the excess of the amount of the tax required to be shown on the return over the amount of the tax imposed which is shown on the return, reduced by any rebate. Sec. 6662(d)(2)(A). A "substantial understatement" of income tax is defined as an understatement of

[*22] tax that exceeds the greater of 10% of the tax required to be shown on the tax return or $5,000.  Sec. 6662(d)(1)(A).

The Commissioner bears the initial burden of production.  Sec. 7491(c).  If the Commissioner satisfies his burden, the taxpayer then bears the ultimate burden of persuasion.  Higbee v. Commissioner, 116 T.C. 438, 446-447 (2001).  Because we hold for petitioner as to the section 911 exclusion, petitioner has no underpayment and hence no accuracy-related penalty as to his excluded foreign earned income.  As to the underpayment relating to petitioner's conceded charitable contribution deduction and miscellaneous itemized deductions, respondent has shown that petitioner failed to keep adequate books and records.  Therefore, respondent has met his burden of production.  See sec. 1.6662-3(b)(1), Income Tax Regs.

The accuracy-related penalty is not imposed with respect to any portion of the underpayment as to which the taxpayer shows that he or she acted with reasonable cause and in good faith.  Sec. 6664(c)(1); Higbee v. Commissioner, 116 T.C. at 448.  Petitioner did not offer any evidence that he acted with

[*23] reasonable cause and good faith.[8]  We therefore find that he is liable for a penalty on the amount of his underpayment attributable to the items he conceded.

VII.  Conclusion

In reaching our holding herein, we have considered all arguments made, and, to the extent not mentioned above, we conclude they are moot, irrelevant, or without merit.

To reflect the foregoing,

Decision will be entered

under Rule 155.

---

[8] Petitioner states for the first time on brief that his records substantiating the charitable and miscellaneous itemized deductions were lost because of poor storage.  See supra note 4.  While we do not question the veracity of his explanation, ex parte statements made on brief are not admissible as evidence. Rule 143(c).