# JAMES B. HARRINGTON, JR. AND SUE M. HARRINGTON, PETITIONERS v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 36922-87.    Filed August 31, 1989.

*Robert M. Bandy,* for the petitioners.
*Gregory S. Garland,* for the respondent.

SCOTT, *Judge:* Respondent determined deficiencies in petitioners' Federal income tax and additions to tax for the years and in the amounts as follows:

| TYE and deficiency | | Additions to tax | |
|---|---|---|---|
| | | Sec. 6653(a)(1) [1] | Sec. 6653(a)(2) |
| Dec. 31, 1983 | $12,388.86 | $619.44 | * |
| Dec. 31, 1984 | 9,447.00 | 472.35 | * |

*50 percent of the interest due on the deficiency.

Some of the issues have been disposed of by agreement of the parties, leaving for our decision whether petitioner, James Harrington (petitioner or Mr. Harrington), should be treated under the provisions of section 911(d)(4) as a "qualified individual" entitled to exclude a portion of his 1983 and 1984 wages from gross income as "foreign earned income."

## FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

---

[1] All section references are to the Internal Revenue Code of 1954 as amended and in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

Petitioners resided in Frankston, Texas, at the time they filed their petition in this case. Petitioner has been employed overseas by SECO Industries, Inc. (SECO) since January 5, 1983, except for a brief period in 1987. Prior to 1983, petitioner served in the U.S. Navy.

Petitioner joined the Navy in August 1960. He received training at the Submarine Reserve Training Center in Galena Park, Texas, and the U.S. Naval Submarine School in New London, Connecticut. Thereafter, petitioner served aboard various conventional and nuclear-powered submarines. Petitioner was assigned to various bases around the United States, depending on where the home port of the submarine on which he was then serving was located. At one time or another during his career in the Navy, petitioner was assigned to home ports in New London, Connecticut, Philadelphia, Pennsylvania, Great Lakes, Illinois, Brunswick, Georgia, Newport News, Virginia, Charleston, South Carolina, Lubbock, Texas, and Bangor, Washington. Petitioner retired from the Navy as of December 31, 1982.

Petitioner married his first wife in 1963. They were divorced in 1974. Petitioner married his present wife, Sue M. Harrington, in October 1975. Every time petitioner was reassigned during his naval career, his (first or second) wife and children would accompany him to his new assignment. Petitioners on their 1983 Federal income tax return claimed exemptions for four children and on their 1984 Federal income tax return claimed exemptions for five children.

In November 1982, petitioner and his family rented a mobile home in Frankston, Texas, where they lived until they completed construction of a permanent home in May 1984. Petitioner (when he was in the United States) and his family have occupied this home since its completion. Mrs. Harrington took care of the home and children during the years at issue. Mrs. Harrington was employed part-time outside the home in 1984. Petitioners attended the Hilltop Baptist Church in Frankston, Texas, and their children attended school in Frankston. Petitioners also maintained a bank account in Texas during the years at issue, possessed State of Texas driver's licenses, and had two vehicles

registered in the State of Texas. Neither petitioner nor Mrs. Harrington was registered to vote in the United States.

On January 4, 1983, petitioner arrived in the People's Republic of Angola (Angola) to begin his employment with SECO. Each time petitioner entered Angola, he was required to surrender his U.S. passport and was issued a visa by the Angolan government covering only the period of his expected work stay. His passport was returned to him when he was required to leave Angola at the end of each work period. If his work period exceeded the expected time covered by the visa, his employer would secure permission from the Angolan government to extend his stay. Petitioner's family was prohibited from accompanying him to Angola or remaining with him in Angola by the Angolan government. During 1983 and 1984, petitioner performed services for Cabinda Gulf Oil Co., Ltd. (Cabinda Gulf) pursuant to a contract between SECO and Cabinda. Cabinda Gulf was the exclusive operator of an oil concession (the Cabinda concession) which was located within the territorial waters of Angola. Sonangol, a corporation wholly owned by the government of Angola, owned 51 percent of the Cabinda concession. During the years at issue, Cabinda Gulf was a wholly owned subsidiary of Gulf Oil. Subsequent to 1984, Chevron purchased the subsidiary and changed its name to the Cabinda Gulf Oil Co., Ltd.

Under the contract between SECO and Cabinda Gulf, SECO provided Cabinda Gulf with technical assistance and advice in the operation of wells and oil production facilities in the Cabinda concession. During 1983 and 1984, petitioner worked as a production operator on the G-S-Lima Production Platform (the platform). The platform was located within the territorial waters of Angola.

During the period at issue, petitioner worked a 28/28 rotation which means that he would work for a period of 28 days and then would have a period of 28 days off from work (sometimes referred to as a rest period). Petitioner's International Letter of Understanding for Employment provided, in part, that "As a general rule, your schedule on this project will consist of [4/6 wks] on assignment on the foreign job site * * * and [3/4 wks.] of rest at your place of origin * * * ." During his 28-day work periods, petitioner

worked 12-hour shifts on the platform. Petitioner's only contacts with the native Angolans occurred aboard this platform. At the end of each such 12-hour shift, he would be transported via helicopter to the "Afran Ocean," a tanker ship which was permanently moored approximately 11.8 miles off the Angolan coast within the territorial waters of Angola (approximately 2 miles from the platform).

During petitioner's 28-day work periods, Cabinda Gulf provided all of his meals, lodging, laundry service, and medical treatment at no charge. Petitioner was assigned living quarters aboard the "Afran Ocean." Petitioner had his own telephone but ate his meals in the officers' mess hall. The ship had some recreational facilities such as an exercise room, television/VCR, and dartboard. During petitioner's 28-day work periods, he spent his free time on the "Afran Ocean" and was not permitted to visit the Angolan mainland.

The People's Republic of Angola is approximately twice the size of Texas and is located on the western coast of the African continent. Angola was settled by the Portuguese in the 15th century and had remained a Portuguese colony until November 1975 when it received its independence. Before its independence, Angola was relatively prosperous compared to other African nations and was a major food exporter. It also exported oil, diamonds, iron ore, and some other items.

Prior to their departure in 1975, the Portuguese attempted to establish a transitional coalition government between the three main political movements in Angola, the Popular Movement for the Liberation of Angola (MPLA), the National Front for the Liberation of Angola (FNLA), and the National Union for the Total Independence of Angola (UNITA). These rival groups had been engaged in a struggle to oust the Portuguese since the early 1960's.

The coalition government collapsed even before Portuguese dominance officially ended. Most westerners (including Portuguese and Americans) fled the country after it gained its independence. The rival political movements received external support from various nations in their attempts to control Angola both before and after the departure of the Portuguese. For example, the MPLA, with

its Marxist philosophy, received military assistance primarily from the Soviet Union and Cuba. The United States supported UNITA and, to a certain extent, the FNLA.

The MPLA, with Soviet and Cuban assistance, eventually established control over most of Angola and formed a government which has survived to date. The Government of the United States does not maintain diplomatic relations with the MPLA-controlled government of Angola and has advised its citizens that travel to Angola is considered dangerous. Since 1975, the FNLA has diminished in importance as a political force and is no longer a military threat to the MPLA. However, UNITA and its leader, Jonas Savimbi, have captured an increasing amount of territory and have destroyed much of Angola's infrastructure (including rail lines, airports, oil production facilities, factories, hospitals, and schools) in their attempts to take control of the country. The country's economy has deteriorated severely and Angola must now import most of its food. During the period in which petitioner worked in Angola, UNITA has attacked a production pipeline, an airport, a plywood factory, and the Malongo onshore oil production facility.

During 1983 and 1984, petitioner returned to the United States and spent the entirety of each 28-day rest period (excluding travel time) with his family in Frankston, Texas. Cabinda Gulf paid petitioner's airfare to and from the United States. At the end of his 28-day rest period, petitioner would return to Angola and obtain another visa covering his 28-day work period. Petitioner was physically present in the People's Republic of Angola for 199 days during his 1983 taxable year and for 179 days during his 1984 taxable year.

Petitioner was not permitted to travel freely within Angola and he had only brief contact with the mainland while in transit between Angola and the United States. For his own protection, petitioner was placed under guard going into and coming out of Angola. Petitioner was not permitted to own real estate in Angola, he was not permitted to drive in Angola, he was not permitted to own personal property in Angola, and he was not permitted to vote in Angolan elections. Petitioner did learn to speak Portuguese,

the prevalent language in Angola, to a moderate degree. Petitioner has never submitted any statement to the Angolan government that he was not a resident of that country nor has he been treated as a nonresident of Angola for Angolan income tax purposes. He has not, however, paid any income taxes to the government of Angola.

Petitioner received $46,125 in wages from SECO in 1983. Petitioners excluded $44,000 of this amount on their joint return for 1983 as foreign earned income under section 911(a). Petitioner received $44,725 in wages from SECO in 1984. On their 1984 joint return, petitioners excluded $38,256 of this amount as foreign earned income under section 911(a). Respondent, in his notice of deficiency mailed to petitioners on August 24, 1987, determined that petitioners were not entitled to claim the benefits of section 911. In his notice of deficiency, respondent also determined that petitioners were liable for additions to tax under section 6653(a)(1) and section 6653(a)(2), but conceded in his answer to the petition that petitioners were not liable for these additions to tax.

In a letter dated November 18, 1987, addressed to the Assistant Secretary (Tax Policy), Department of Treasury, petitioners' attorney requested on behalf of petitioners that Angola be placed on the list of countries (contained in Rev. Proc. 81-23, 1981-1 C.B. 693, as updated by Rev. Proc. 86-39, 1986-2 C.B. 701) for which the "qualified individual" requirements of paragraph (1) of section 911(d) may be waived. An identical letter, also dated November 18, 1987, was sent to "Gerald Traficonti, Tax Law Specialist, Office of the Chief Counsel, International Branch One, Internal Revenue Service." By letter dated March 22, 1988, the Internal Revenue Service declined to place Angola on the waiver list. The denial letter reads, in part, as follows:

As you know, the minimum time requirements of section 911(d)(1) of the Code may be waived if a qualified individual must leave a foreign country because of war, civil unrest, or similar adverse conditions in that country. These conditions, however, are determined by the Secretary of Treasury in consultation with the Secretary of State as required by section 911(d)(4) of the Code. Section 911(d) does not grant the Service unilateral discretionary authority to waive the time requirements in individual situations which are not covered by the waiver list. The lack of this authority then precludes the Service from adding Angola to the

waiver list because of the unfortunate experiences of the taxpayer in Angola.

## OPINION

The only issue for decision is whether petitioner should be treated as a "qualified individual" who is entitled to exclude a portion of the wages he received from SECO in 1983 and 1984 as "foreign earned income" in accordance with section 911(a)(1).

Section 911(a)(1) provides, in part, that, "At the election of a *qualified individual* * * * , there shall be excluded from the gross income of such individual, and exempt from taxation under this subtitle, for any taxable year * * * the *foreign earned income* of such individual * * * ." (Emphasis supplied.) Section 911(b)(1)(A) defines the term "foreign earned income" as amounts received by an individual from sources within a foreign country which constitute earned income attributable to services performed by such individual "during the period described in subparagraph (A) or (B) of subsection (d)(1), whichever is applicable." Section 911(d)(1), defines the term "qualified individual" as follows:

(1) The term "qualified individual" means an individual whose tax home is in a foreign country and who is—

   (A) a citizen of the United States and establishes to the satisfaction of the Secretary that he has been a bona fide resident of a foreign country or countries for an uninterrupted period which includes an entire taxable year, or

   (B) a citizen or resident of the United States and who, during any period of twelve consecutive months, is present in a foreign country or countries during at least 330 full days in such period.

Paragraph (1) of section 911(d) thus establishes two requirements which a taxpayer must meet in order to be considered a qualified individual for purposes of section 911(a). First, the taxpayer's "tax home" for purposes of section 911 must have been in a foreign country during the period at issue. Section 911(d)(3) defines the term "tax home" as the taxpayer's home for purposes of section 162(a)(2), but provides that the taxpayer will not be treated as having a tax home in a foreign country during any period in which his "abode" is within the United States.

Second, the taxpayer must have either been a bona fide resident of a foreign country for an uninterrupted period which includes an entire taxable year (the "bona fide residence" test) or the taxpayer must have been physically present in a foreign country for 330 days during a consecutive 12-month period (the "physical presence" test).

Generally, therefore, only if a taxpayer meets both the tax home requirement and satisfies either the bona fide residence or physical presence test, will he be entitled to exclude, as foreign earned income, that portion of his wages which are attributable to the period during which he was a qualified individual. However, under certain circumstances, a taxpayer may be entitled to take advantage of the foreign earned income exclusion despite his failure to satisfy the requirements of paragraph (1) of section 911(d).

Section 911(d)(4) provides that, notwithstanding paragraph (1), a taxpayer who:

(A) is a bona fide resident of, or is present in, a foreign country for any period,

(B) leaves such foreign country after August 31, 1978—

(i) during any period during which the Secretary determines, after consultation with the Secretary of State or his delegate, that individuals were required to leave such foreign country because of war, civil unrest, or similar adverse conditions in such foreign country which precluded the normal conduct of business by such individuals, and

(ii) before meeting the requirements of such paragraph (1), and

(C) establishes to the satisfaction of the Secretary that such individual could reasonably have been expected to have met such requirements but for the conditions referred to in clause (i) of subparagraph (B),

shall be treated as a qualified individual with respect to the period described in subparagraph (A) during which he was a bona fide resident of, or was present in, the foreign country, and in applying subsections (b)(2)(A) and (c)(1)(B)(ii) with respect to such individual, only the days within such period shall be taken into account.

In the instant case, petitioners argue that Mr. Harrington should be treated as a qualified individual for purposes of section 911 under the provisions of section 911(d)(4). Petitioners first argue that, for purposes of section 911, Mr. Harrington's "tax home" was in Angola during the period in which he earned the income he is attempting to exclude.

Petitioners concede that Mr. Harrington does not meet the bona fide residence test or the physical presence test.

However, they contend that a state of war, civil unrest, or similar adverse conditions existed in Angola during the years 1983 and 1984 and that petitioner and other individuals were required to leave Angola during such period because of war, civil unrest, or other similar adverse conditions, which conditions precluded the normal conduct of business by such individuals. Petitioners argue that Mr. Harrington was required to leave Angola at the end of each 28-day work period because of the state of war, civil unrest, or similar adverse conditions. Finally, petitioners contend that, but for the war, civil unrest, and similar adverse conditions, Mr. Harrington could reasonably have been expected to satisfy the requirements of paragraph (1) of section 911(d).

Petitioners argue that the Secretary's failure to grant a waiver under section 911(d)(4) was arbitrary and unreasonable and amounts to a denial of petitioner's substantive due process rights under the Fifth Amendment to the Constitution. Petitioners also contend that the conditions and circumstances which existed in Angola are virtually indistinguishable from conditions which existed in other countries which have been placed on the list of countries for which the bona fide residence and physical presence requirements have been waived and, therefore, the Secretary has acted arbitrarily in failing to add Angola to this list. Finally, petitioners claim that their procedural due process rights under the Fifth Amendment to the Constitution have been violated because they were denied the opportunity for notice and hearing with regard to their request that Angola be placed on the waiver list.

Respondent argues that we need not address petitioners' constitutional arguments since petitioners are not entitled to the foreign earned income exclusion under the facts shown in this case. Respondent contends that Mr. Harrington's abode and, therefore, his tax home (for purposes of section 911) remained in the United States during the years at issue. Although respondent agrees with petitioners that Mr. Harrington does not satisfy either the bona fide residence or physical presence test, he does not agree that Mr. Harrington should be treated as a qualified individual under paragraph (4) of section 911(d).

Respondent points out that petitioners' entitlement to the waiver provided in section 911(d)(4) is expressly conditioned on a determination by the Secretary that individuals were required to leave Angola because of war, civil unrest, or similar adverse conditions which precluded the normal conduct of business by such individuals. Respondent further points out that the Secretary has not made such determination and consequently has not placed the People's Republic of Angola on the list of countries for which satisfaction of the bona fide residence and physical presence tests may be waived. Respondent argues that, although section 911(d) does not expressly preclude judicial review, the Secretary's determination under section 911(d)(4) is committed to agency discretion by law and is not subject to judicial review.

Respondent further argues that, even if we should conclude that the Secretary's actions are reviewable by this Court, the Secretary did not abuse his discretion in denying petitioners' request for a waiver. Respondent first contends that the principal reason individuals were required to leave Angola was because the Marxist government of Angola forced them to leave, not because of the war, civil unrest, and similar adverse conditions which admittedly existed in Angola. In addition, respondent argues that such conditions did not preclude the normal conduct of business by such individuals, as is evidenced by petitioner's continued employment in Angola. Respondent also argues that in using the term "leave" in section 911(d)(4), Congress intended a permanent, or at least indefinite, departure from the foreign country in question and not the continual cycle of arrival and departure which characterized Mr. Harrington's rotational schedule. Respondent points out that such rotational schedules appear to be common in the oil industry and, therefore, the nature of petitioner's schedule, rather than the conditions which existed in Angola, caused him to leave the country at regular intervals.

Respondent further contends that, even if he is incorrect and petitioners can establish the applicability of section 911(d)(4), they must still establish that, but for the war, civil unrest, or other similar adverse conditions, they could reasonably have been expected to meet the requirements of

section 911(d)(1). Respondent submits that petitioners have failed to offer any evidence, other than their own self-serving testimony, that they could have met such requirements but for the conditions in Angola.

In answer to petitioners' constitutional arguments, respondent points out that petitioners have not yet paid the deficiency at issue and, therefore, have not, as of yet, suffered any deprivation which might bring the protections of the Fifth Amendment into play. Respondent also argues that petitioners have no preexisting constitutional right to the statutory exclusion provided for in section 911(a) or to the waiver provided for in section 911(d)(4). Finally, respondent argues that, if we conclude that the Secretary's decision is reviewable by this Court, petitioners will have the opportunity to contest that decision in this Court and, therefore, their procedural due process rights have been safeguarded.

Leaving aside petitioners' argument that Mr. Harrington is entitled to a waiver under section 911(d)(4), we initially conclude that petitioners have failed to establish that Mr. Harrington meets the tax home and either the bona fide residence or physical presence requirements of section 911(d)(1).

Section 911(d)(3) provides that, for purposes of section 911, a taxpayer's "tax home" is his home for purposes of section 162(a)(2) (relating to traveling expenses while away from home). As a general rule, a taxpayer's "tax home" for purposes of section 162(a)(2) is located at his principal place of business. However, the general rule of section 162(a) is subject to an exception under section 911. Section 911(d)(3) provides that, for purposes of section 911, "An individual shall not be treated as having a tax home in a foreign country for any period for which his *abode* is within the United States." (Emphasis supplied.) Sec. 1.911-2(b), Income Tax Regs. Therefore, regardless of where Mr. Harrington's principal place of business is located, he will not be treated as having a tax home in Angola for any period during which his "abode" was in the United States.

In prior section 911 cases, we have examined and contrasted the taxpayer's domestic ties (i.e., his familial, economic, and personal ties) to the United States with his

ties to the foreign country in which he claims a tax home in order to determine whether his abode was in the United States during any particular period. *Lemay v. Commissioner*, T.C. Memo. 1987-256, affd. 837 F.2d 681 (5th Cir. 1988); *Bujol v. Commissioner*, T.C. Memo. 1987-230, affd. without published opinion 842 F.2d 328 (5th Cir. 1988); *Hummer v. Commissioner*, T.C. Memo. 1988-528; *Bosarge v. Commissioner*, T.C. Memo. 1989-15; *Benham v. Commissioner*, T.C. Memo. 1989-215; and *Moudy v. Commissioner*, T.C. Memo. 1989-216. Even though a taxpayer may have some limited ties to a foreign country, if his ties to the United States remain strong, we have held that his abode remained within the United States, especially where his ties to the foreign country were transitory or limited. In *Lemay v. Commissioner*, 837 F.2d 681 (5th Cir. 1988), affg. a Memorandum Opinion of this Court, the Fifth Circuit, to which an appeal in this case would lie, adopted and applied this domestic ties analysis.

In *Lemay v. Commissioner, supra*, the taxpayer, who had resided in Lake Charles, Louisiana, prior to being transferred overseas, worked on an offshore rig in the territorial waters of Tunisia. His contacts with Tunisia were extremely limited. He spent most of his 28-day work period on the rig and returned to his family in the United States at the start of each 28-day rest period. However, because of his supervisory position, the taxpayer was occasionally required to travel to his employer's offices on the Tunisian mainland. While on the mainland, he stayed in a hotel or an apartment provided by his employer. He sometimes met with Tunisian officials and attended at least one local soccer match.

Despite these contacts with Tunisia and its residents, the Fifth Circuit found no error in our conclusion that, because the taxpayer had retained strong economic, familial, and personal ties to his residence in Louisiana, his abode remained within the United States during the year at issue. The Fifth Circuit stated that:

Lemay spent approximately half of his time with his family in Louisiana. He voted in Louisiana, maintained a bank account in Louisiana, and possessed a Louisiana driver's license. The combination of these factors, when contrasted with Lemay's transitory contacts with

Tunisia, support the conclusion that Lemay's "abode" remained in Louisiana in 1982. [*Lemay v. Commissioner, supra* at 684.]

The same type of factors which supported the holding in *Lemay v. Commissioner, supra,* also support our conclusion here that Mr. Harrington retained strong domestic ties to his home in Texas and, therefore, his abode remained within the United States during the years at issue. Mr. Harrington returned to the United States during each rest period and spent almost half his time with his family who continued to reside in Frankston, Texas. Mr. Harrington attended the Hilltop Baptist Church in Frankston. His children attended school in Frankston. He and Mrs. Harrington maintained bank accounts in Frankston. He possessed a State of Texas driver's license and owned two vehicles which were registered in Texas. In short, even though petitioner's job may have forced him to spend a substantial amount of time in Angola, his strong domestic ties to his home and family in Texas remained undisturbed.

In contrast, his ties to Angola were, for the most part, nonexistent. He did not spend his rest periods in Angola, he did not own land or vehicles in Angola, he did not travel within Angola, he did not bring his family to Angola, he did not maintain bank accounts in Angola, and he did not go to church in Angola. Although Mr. Harrington may have worked with some Angolans on the offshore drilling platform, he did not form any friendships and did not establish any contacts with Angolans outside of the workplace. In short, Mr. Harrington was completely isolated from everyday Angolan life and thus his ties to Angola were severely limited and transitory.

Because Mr. Harrington maintained strong domestic ties to his home and family in Texas, while his ties to Angola were limited and transitory, his abode and, therefore, his tax home for purposes of section 911 remained in the United States throughout the years at issue.

Petitioners argue, however, that the term "abode" was not properly defined in *Lemay v. Commissioner, supra,* and urge us to adopt a broader construction of the term. Petitioners admit that Mr. Harrington's "abode" was in the United States during his rest periods but argue that Mr.

Harrington's "abode" was in Angola during his work periods when he was physically present in Angola.

Petitioners also note that, in *Lemay v. Commissioner, supra,* and other cases of this Court in which we construed the term "abode," the taxpayers had claimed that they were bona fide residents of a foreign country, not that they were physically present in a foreign country. In the instant case, petitioners claim the exclusion based on their argument that they would have satisfied the physical presence test, as well as the bona fide residence test, but for the war, civil unrest, or other similar conditions which existed in Angola. Petitioners submit that the meaning of the term "abode" in the context of the physical presence test is distinguishable from its meaning in the context of the bona fide residency test.

We do not agree. There is no support for petitioners' argument that the term "abode" should be construed differently when a taxpayer's claim to the foreign earned income exclusion is based on satisfaction of the physical presence test, rather than the bona fide residency test. The placement of the tax home requirement in the first clause within section 911(d)(1) indicates that it was Congress' intention that all taxpayers satisfy the same requirement with respect to "tax home" whether their claim to the foreign earned income exclusion was based on physical presence or bona fide residency. We conclude that this case is not distinguishable from *Lemay v. Commissioner, supra* and is controlled by the holding in that case.

Petitioners concede that Mr. Harrington was not a bona fide resident of Angola in 1983 or 1984 and was not present in Angola for 330 days during any consecutive 12-month period. Petitioners' contention is that the requirements of section 911(d)(1) should have been waived by respondent under the provisions of section 911(d)(4).

As an initial matter, we do not consider it necessary in this case to determine whether judicial review is appropriate as to the Secretary's refusal to include Angola on the list of countries set forth in Rev. Proc. 81-23, 1981-1 C.B. 693, and Rev. Proc. 86-39, 1986-2 C.B. 701. In our view, petitioner has failed to show the basic facts necessary to have section 911(d)(4) apply in his case even if Angola had been placed

on the waiver list. In order to be treated as a "qualified individual" under section 911(d)(4)(C) the taxpayer must establish, to the satisfaction of the Secretary, that he could reasonably have been expected to meet the requirements of paragraph (1) except for war, civil unrest, or similar adverse conditions existing in the country. Sec. 1.911-2(f), Income Tax Regs.

Even though the statute requires the taxpayer to establish a reasonable expectancy "to the satisfaction of the Secretary," use of the quoted phrase certainly does not foreclose review of the Secretary's determination that a taxpayer has failed to meet the requirements of section 911(d)(4)(C). *Schoneberger v. Commissioner,* 74 T.C. 1016, 1023 (1980). The phrase in question also appears in subparagraph (A) of section 911(d)(1) which requires that the taxpayer establish, to the satisfaction of the Secretary, that he was a bona fide resident for an uninterrupted period which includes an entire taxable year.

In *Schoneberger v. Commissioner, supra,* we concluded that the Secretary's determination under section 911(d)(1)(A) was subject to review but that the legislative history of section 911, as well as the plain language of subparagraph (A) of section 911(d)(1), indicated that the phrase in question required additional deference to the determinations of the Secretary. Therefore, the taxpayer would have to show by "strong proof," rather than a mere preponderance of the evidence, that he was a bona fide resident of a foreign country during the years in question. *Schoneberger v. Commissioner, supra* at 1024. We conclude that the "strong proof" standard is also appropriate in reviewing the Secretary's determination with respect to another part of the same statutory provision, namely the requirements of subparagraph (C) of section 911(d)(4).

Petitioners claim that Mr. Harrington could reasonably have been expected to meet all of the requirements of section 911(d)(1) but for war, civil unrest, or similar adverse conditions which they claim existed in Angola. Petitioners ask us to assume that, but for these conditions, his wife and family would have accompanied him to Angola as they did to his stations in the United States during his service in the Navy. Petitioners argue that but for this war and civil

unrest in Angola, Mr. Harrington would have moved his family to Angola and established a tax home there for purposes of section 911. Petitioners also ask us to assume that, but for these conditions, Mr. Harrington would have become a bona fide resident of Angola. Petitioners further contend that, but for the war, civil unrest, or similar adverse conditions which may have existed in Angola, Mr. Harrington's employer would not have placed him on a rotational work schedule and he would not have returned to the United States at the end of each work period. Therefore, petitioners ask us to assume that, but for these conditions, Mr. Harrington would have maintained a physical presence in Angola for the requisite 330 days.

Petitioners ask us to assume too much. Their arguments are sheer speculation and are not supported by credible evidence. Congress utilized the phrase "but for" in subparagraph (C) of section 911(d)(4) to impose a requirement of immediate and direct causation. We do not agree that war, civil unrest, or similar adverse condition caused Mr. Harrington's failure to meet the requirements of section 911(d)(1).

Contrary to petitioners' assertion, Mr. Harrington was not placed on a rotational work schedule solely because of the conditions which happened to exist in the country of Angola. The 28/28 rotational schedule is not at all uncommon for certain American workers in foreign countries and certainly is not unique to the country of Angola. Many U.S. taxpayers who are employed abroad by oil and construction companies are placed on a 28/28 work schedule or some variation thereof, regardless of the foreign country in which they are employed. Respondent offered the testimony of a witness as to the use of the 28/28 rotational schedule by companies operating in countries other than Angola. We have decided a number of cases involving taxpayers with such work schedules. See *Lemay v. Commissioner, supra; Bujol v. Commissioner,* T.C. Memo. 1987-230, affd. without published opinion 842 F.2d 328 (5th Cir. 1988); *Hummer v. Commissioner,* T.C. Memo. 1988-528; *Bosarge v. Commissioner,* T.C. Memo. 1989-15; *Benham v. Commissioner,* T.C. Memo. 1989-215; and *Moudy v. Commissioner,* T.C. Memo. 1989-216. Petitioners have made no showing that Mr.

Harrington's rotational schedule was due to conditions in Angola.

We conclude that the direct cause of Mr. Harrington's departures from Angola at the end of each work period was the restrictive visa policy of the Communist government of Angola. In any event, even if Mr. Harrington had not been forced to leave Angola, we consider it likely he would have done so. Thus, we conclude that Mr. Harrington was not prevented from establishing a tax home (for purposes of section 911), establishing a residence, or being physically present in the foreign country of Angola by war, civil unrest, or similar adverse conditions. He was prevented from meeting these requirements, even if he had desired otherwise, by the Angolan government which restricted his access to the country and its people.

In further support of our conclusion, we point out that, at trial, Mr. Harrington testified that, even if the ongoing struggle within Angola had ended, he probably would not have brought his family to Angola because of the poor living conditions within that country. There was no suitable housing available in Angola. The country had no adequate hospitals. The country had no schools that could provide his children with a suitable education. The country had no adequate grocery stores in which to shop. We conclude that Mr. Harrington failed to sever his domestic ties to the United States, establish a family residence in Angola, or remain in Angola for the requisite number of days, because he was employed on a rotational schedule that did not provide for bringing his family to Angola, and that, even if Mr. Harrington had been permitted by the Angolan government to bring his family to Angola, he would not have done so since he did not want to force his family to live without the basic facilities which were not available in Angola. Petitioner has failed to show that, "but for" the conditions which existed in Angola, Mr. Harrington would have met the requirements of section 911(d)(1).

Petitioners' case fails for yet another reason. Subparagraph (C) of section 911(d)(4) specifically requires that there must have existed a *reasonable expectancy* that Mr. Harrington would be able to meet the requirements of section 911(d)(1) but for the war, civil unrest, or similar,

adverse conditions. It is not clear from the language of the statute *who* must entertain this expectancy. However, the provision's legislative history, as well as simple logic, indicate that the expectancy must be personal to the taxpayer. S. Rept. 96-1031 (1980), 1980-2 C.B. 730, 732. The job of judging the reasonableness of such expectancy falls initially to the Secretary and then to the courts.

In our view Mr. Harrington could not have, at any time prior to his initial departure for Angola or at any subsequent time, entertained a reasonable expectancy that he would be able to meet the requirements of section 911(d)(1). Every taxpayer is charged with knowledge of the tax laws. Therefore, for purposes of our discussion, we must assume that Mr. Harrington was aware that he had to satisfy the tax home requirement and either the bona fide residence or physical presence requirements of section 911(d)(1) in order to be treated as a "qualified individual" for purposes of section 911. When he accepted employment in Angola, Mr. Harrington was aware of the rotational nature of his work schedule, the fact that he would have to leave Angola at the end of each 28-day work period, the approximate amount of time he would spend in Angola under this schedule, and the fact that he would return to the United States at the end of each work period. Indeed, petitioner's International Letter of Understanding for Employment provided, in part, that, "As a general rule, your schedule on this project will consist of [4/6 wks] on assignment on the foreign job site * * * and [3/4 wks.] of rest at your place of origin * * * ."

We are certain that he was also aware of the conditions which existed in Angola. The struggle between UNITA and the communist government of Angola had been ongoing for almost a decade prior to Mr. Harrington's arrival in Angola. There is absolutely no indication in the record that Mr. Harrington was unaware of the conditions which existed in Angola prior to his initial departure for that country. His knowledge of these conditions was undoubtedly augmented during his first 28-day work period. Given these facts, we do not see how Mr. Harrington (or anyone else for that matter) could possibly have, either prior to his arrival in Angola or after any of his numerous departures, harbored any reasonable expectation that he would satisfy the

requirements of paragraph (1). We simply do not believe that Congress intended the waiver provision to be available when a taxpayer begins employment in an already unstable foreign country where there was never even the slightest chance he would satisfy the "qualified individual" requirements. S. Rept. 96-1031 (1980), 1980-2 C.B. 730, 732. This lack of this reasonable expectancy is fatal to petitioners' case.

Petitioners' case fails for many more reasons, some of which bear discussion, but most of which do not. First of all, it is clear that any claim to a waiver of the requirements of section 911(d)(1), based upon an argument that (but for the conditions which existed in Angola) Mr. Harrington would have met the bona fide residency requirement, must fail. In order to be entitled to a waiver under section 911(d)(4) based upon bona fide residency, subparagraph (A) clearly requires that the taxpayer must have been, at some point, a bona fide resident of the country he flees. Petitioners concede, however, that Mr. Harrington was never a bona fide resident of Angola. Therefore, under no circumstances would he be entitled to a waiver based upon bona fide residency.

Second, it is clear that Mr. Harrington was never forced to "leave" Angola as contemplated in section 911(d)(4)(B). Petitioners contend that the term "leave," as used in section 911(d)(4)(B), encompasses Mr. Harrington's periodic departures from Angola even though he always expected to return to Angola, in accordance with his employment contract, within a short time after his departure. We disagree. The waiver provision was enacted shortly after many U.S. taxpayers were forced to leave Iran due to the overthrow of the Shah. The Senate Finance Committee Report on section 1(a) of the act of December 28, 1980, (the act) Pub. L. 96-608 94 Stat. 350, provides that:

Because of the recent civil unrest in Iran, a number of Americans who were working there with the expectation of meeting the foreign residence or presence requirements returned to the United States prior to the time those requirements were actually met. The committee believes that, in a case where an individual goes abroad with the expectation of meeting the foreign residence or physical presence requirements, but fails to meet those requirments because of extraordinary circumstances beyond his control, relief should be afforded from the time limitations because of the

316

special circumstances involved. [S. Rept. 96-1031 (1980), 1980-2 C.B. 730, 732.]

Unlike the taxpayers who fled Iran with no hope of returning in the foreseeable future, Mr. Harrington left Angola with every intention of returning within a short period of time and, indeed, was required to return by his employment contract. When Congress enacted the waiver provision, a more permanent type of departure than Mr. Harrington's periodic departures from, and preplanned returns to, the People's Republic of Angola was contemplated. Thus, petitioners claim also fails because Mr. Harrington never left Angola as contemplated by the statute.

Petitioners raise numerous other arguments in support of their claim that they are entitled to a waiver of the "qualified individual" requirements of section 911(d)(1). However, in view of our disposition of this case, we need not reach these questions and need not address petitioners' constitutional contentions.

*Decision will be entered under Rule 155.*