# United States Tax Court

T.C. Summary Opinion 2022-10

ALFRED CHRISTOPHER MORGAN,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

_____

Docket No. 20912-19S.                                    Filed June 23, 2022.

_____

Alfred Christopher Morgan, pro se.

*Daniel K. McClendon* and *William J. Prater*, for respondent.


SUMMARY OPINION

WELLS, *Judge*:  This case was heard pursuant to the provisions of section 7463 of the Internal Revenue Code in effect when the petition was filed.[1]  Pursuant to section 7463(b), the decision to be entered is not reviewable by any other court, and this opinion shall not be treated as precedent for any other case.

Petitioner failed to file a timely federal income tax return for taxable year 2016 (year in issue), which led respondent to prepare a substitute for return in accordance with section 6020(b).  Respondent subsequently issued a notice of deficiency to petitioner determining an income tax deficiency of $28,932, plus additions to tax.  Petitioner filed

---

[1] Unless otherwise indicated, all statutory references are to the Internal Revenue Code, Title 26 U.S.C., in effect at all relevant times, all regulation references are to the Code of Federal Regulations, Title 26 (Treas. Reg.), in effect at all relevant times, and all Rule references are to the Tax Court Rules of Practice and Procedure. Monetary amounts are rounded to the nearest dollar.

a timely Petition for redetermination with the Court disputing the notice of deficiency. He resided in Saudi Arabia when the Petition was filed.

After concessions by both parties,[2] the issues remaining for decision are (1) whether petitioner is entitled to exclude from gross income, as "foreign earned income" under section 911(a)(1), the wages he earned while employed as a contractor in Saudi Arabia and (2) whether he is liable for failure-to-file and failure-to-pay additions to tax under section 6651(a)(1) and (2), respectively.

## Background[3]

I.    *Petitioner's Background and United States Ties*

Petitioner was born in Kingston, Jamaica, but later moved to and grew up in the United States. He enlisted in the U.S. Army in 1988 and eventually became a U.S. citizen during his military service sometime in or around 1996. While serving, petitioner was stationed at Fort Benning near Columbus, GA, and at Fort Hood near Killeen, TX, where he typically resided in military-provided housing. He retired from the U.S. Army in 2008 and thereafter purchased a home at 247 Parkway Drive, Fairburn, GA. Petitioner's daughter lived with him in this home and continued to reside there following his acceptance of a job outside the United States in 2013. Petitioner opted against renting it out, in part to maintain a place for his daughter to live until she found a place of her own. The mortgage on the home and lawn maintenance fees were both paid via petitioner's military retirement checks as he retained sole financial responsibility for the upkeep of the home. He has not owned or rented any other property in the United States.

Petitioner's mother, daughter, brother, and sisters all live in the United States. He rarely visits his brother and sisters but generally uses his leave from work to visit his mother and daughter. In 2016 petitioner spent about two weeks in the United States visiting his then 29-year-old daughter at the home he owned in Georgia, and about one week visiting his then 80-year-old mother at her home in Chattanooga,

---

[2] Respondent concedes that petitioner (1) is not liable for the addition to tax for failure to pay estimated tax under section 6654 and (2) did not realize cancellation of debt income of $2,286. Respondent also concedes that petitioner properly elected to exclude his foreign earned income for the 2016 tax year because he had elected it in previous years. By statute, an initial foreign earned income exclusion election continues to apply to subsequent taxable years unless it is revoked. *See* I.R.C. § 911(e).

[3] Some of the facts have been stipulated.

TN.  He was not primarily responsible for providing living assistance to his immediate relatives.  He was also married at some point, but the record is unclear as to what support, if any, he provides to his former spouse.  He became divorced in 2006 and remains legally unmarried.

During the year in issue petitioner maintained a U.S. bank account (as a requirement of his employment in Saudi Arabia), a U.S. driver's license, and U.S. medical insurance that supports retired military, and he retained his U.S. citizenship.  He did not visit any doctors, dentists, or other medical providers while he was in the United States in 2016.  He registered to vote in the 2012 U.S. Presidential election, and presumably had his voting registration automatically renewed to allow him to vote in the 2016 U.S. Presidential election.

II.  *Employment at Vinnell Arabia and Life in Saudi Arabia*

Petitioner accepted an offer of employment from Vinnell Arabia (Vinnell) in 2013 to work as a quality control manager in Saudi Arabia under a U.S. government contract; he has renewed his contract with Vinnell under mutual agreement every year since then.  As part of his role, petitioner is tasked with training the Saudi Arabia National Guard in rotary aviation.  He is primarily responsible for mission assurance and quality safety—i.e., ensuring that members of the Saudi Arabia National Guard are in compliance with regulatory standards of rotary aviation, such as AS110 and ISO 9100.  In a letter dated September 28, 2020, Vinnell representatives described petitioner as "highly valued," his performance as "excellent," and his role as "essential."

In 2016 petitioner worked 9 hours per day, 5 days per week, splitting his time equally between collecting data at an airfield and entering that data into a database in an office.  In his free time petitioner served as the president of a social club in Saudi Arabia called the Worldwide Fraternity of Turtles, of which he has been a member since 2014.  The social club is a local chapter of a charitable fraternity that organizes food and clothing drives and donates collected items to home shelters and orphanages within local communities.  He also spent much of his free time using the amenities at the compound where he lived and visiting local grocery stores and restaurants.  On the weekends, which are Fridays and Saturdays, he typically traveled with other contractors to places including South Africa, Bahrain, and Dubai to partake in recreational activities that are otherwise forbidden in Saudi Arabia.

Petitioner's employee benefit plan grants him 32 total days of leave per year and provides about $800 per month to cover travel and food expenses during his leave. Petitioner used his leave in 2016 to travel back to the United States to spend time with his daughter and mother. In addition to those benefits petitioner resides in an employer-provided housing compound more similar in appearance to a military compound than to an apartment complex. The compound has a swimming pool, a recreational facility, an exercise gym, and a convenience store. Since 2015 he has lived in the same villa within the compound, which he shares with two other contractors.

Petitioner continues to work in Saudi Arabia for Vinnell. He is currently engaged to a woman who works as a manager of a local beauty salon in Saudi Arabia. He has not sought work in any other country outside of Saudi Arabia and earned wage income in 2016 only from his employment with Vinnell. He does not pay tax to Saudi Arabia on his wage income because it is excepted from Saudi Arabia's value added tax (VAT). As a requirement (or consequence) of his employment with Vinnell, petitioner has obtained Saudi Arabian proof of residence (referred to as an *Iqama*), Saudi Arabian medical insurance, and a Saudi Arabian driver's license.

III.   *Notice of Deficiency*

Petitioner failed to file a federal income tax return for the 2016 taxable year on or before the April 15, 2017, due date. In June 2019 respondent prepared a substitute for return pursuant to section 6020(b) and issued a notice of deficiency determining that petitioner received unreported wage income of $109,024 and an unreported pension distribution of $20,069. Respondent further determined that petitioner was not entitled to the section 911(a) foreign earned income exclusion for 2016 and that he was liable for additions to tax under section 6651(a)(1) and (2).

Petitioner timely filed a Petition arguing that he qualifies for the foreign earned income exclusion because he is a resident of Saudi Arabia and otherwise meets the bona fide residence requirements of section 911. After filing his Petition, petitioner provided respondent with a Form W–2, Wage and Tax Statement, showing $109,024 in taxable wages, a Form 1099–R, Distributions From Pensions, Annuities, Retirement or Profit-Sharing Plans, IRAs, Insurance Contracts, etc., showing $20,069 in taxable pension distributions, and a 2016 Form 1040, U.S. Individual Income Tax Return, reflecting the above amounts

offset by excludable foreign earned income of $94,412. On Form 2555, Foreign Earned Income, attached to his 2016 tax return, petitioner took the position that his tax home for 2016 was Saudi Arabia and excluded his wages earned there from his gross income under section 911(a). He reported that he took two trips to the United States for a total of 25 days in 2016: one trip for 17 days between May 25 and June 11, and a second trip for 8 days between December 24 and December 31.

We heard testimony from petitioner remotely via Zoom in October 2020 during the Court's Atlanta, GA, trial session.

## Discussion

As a general rule, the Commissioner's determinations of a taxpayer's liability in a notice of deficiency are presumed correct, and the taxpayer bears the burden of proving that those determinations are erroneous. Rule 142(a); *Welch v. Helvering*, 290 U.S. 111, 115 (1933). Section 7491(a) shifts the burden of proof to the Commissioner as to any factual issue relevant to a taxpayer's liability for tax if the taxpayer meets certain preliminary conditions. *See Higbee v. Commissioner*, 116 T.C. 438, 442–43 (2001). Petitioner does not contend, and respondent has not conceded, that the burden of proof has shifted to respondent pursuant to section 7491(a). Consequently, we conclude that petitioner bears the burden of proving that respondent's income tax deficiency determinations are erroneous.

I.    *Foreign Earned Income Exclusion*

Section 61(a) provides that gross income means "all income from whatever source derived." Citizens of the United States are taxed on their worldwide income unless a specific exclusion applies. *Specking v. Commissioner*, 117 T.C. 95, 101–02 (2001), *aff'd sub nom. Haessly v. Commissioner*, 68 F. App'x 44 (9th Cir. 2003), *and Umbach v. Commissioner*, 357 F.3d 1108 (10th Cir. 2003). Exclusions from income are construed narrowly, and a taxpayer must clearly establish entitlement to any such exclusion. *Id.* at 101.

Section 911(a)(1) provides, in relevant part, that a "qualified individual" may elect to exclude from gross income his or her "foreign earned income" subject to limitations set forth in subsection (b)(2). Foreign earned income is "the amount received by such individual from sources within a foreign country or countries which constitute earned income attributable to services performed by such individual." I.R.C. § 911(b)(1)(A).

To be a qualified individual a taxpayer must satisfy two requirements: (1) the taxpayer must either be physically present in a foreign country or countries during at least 330 full days in a 12-month period or be a "bona fide resident" of one or more foreign countries for an uninterrupted period which includes an entire taxable year and (2) the taxpayer must be an individual "whose tax home is in a foreign country." I.R.C. § 911(d)(1).

A.     *Physical Presence*

Under section 911(d)(1)(B), a taxpayer who spends at least 330 days during an applicable period in a foreign country or countries will satisfy the physical presence requirement for the related tax year. For this purpose, a taxpayer is to aggregate all foreign days falling within any one applicable period. Treas. Reg. § 1.911-2(d)(1) and (2). Under section 911, a foreign country includes airspace, lands, and territorial waters under the sovereignty of a country, territory, or possession other than the United States. *Farrell v. United States*, 313 F.3d 1214, 1216 (9th Cir. 2002); *Arnett v. Commissioner*, 126 T.C. 89, 93–95 (2006), *aff'd*, 473 F.3d 790 (7th Cir. 2007); Treas. Reg. § 1.911-2(g) and (h).

Petitioner contends that he satisfies the physical presence requirement because he spent less than 35 days in the United States throughout the entirety of the year in issue. On his Form 2555 he reported two trips to the United States during 2016 for a total of 25 days: one trip for 17 days between May 25 and June 11 and a second trip for 8 days between December 24 and December 31. At trial he testified that he spent 14 days in July to visit his daughter in Fairburn, GA, and 7 days in December to visit his mother in Chattanooga, TN, for a total of 21 days in the United States during 2016. Respondent urges us to cast doubt upon petitioner's reported time spent in the United States because his testimony does not exactly correspond with the information provided on his Form 2555; however, we find that the small disparity was an honest mistake and that his testimony as a whole was credible. Each of these representations falls short both of the 32 total days per year in leave he receives as part of his employment benefits and of the 35-day threshold of permissible days spent in the United States during a given tax year. Further, while petitioner occasionally spent weekends away from Saudi Arabia, he used that time to visit other foreign places including Bahrain, South Africa, and Dubai, not to return to the United States. Consequently, we find that petitioner was present in a foreign country or countries for at least 330 full days during the period from

January 1 through December 31, 2016, and that he thereby satisfies the physical presence requirement for the entirety of the year in issue.

Because petitioner meets the first requirement of the foreign earned income exclusion, we will forgo analysis of whether he was also a bona fide resident of one or more foreign countries, which entails overlapping inquiries with the tax home requirements. *See, e.g.*, *Wood v. Commissioner*, T.C. Memo. 2021-103, at *12.

B.      *Foreign Tax Home*

Section 911(d)(3) defines "tax home" as an individual's home for purposes of section 162(a)(2), which is generally "the vicinity of the taxpayer's principal place of employment and not where his or her personal residence is located." *Mitchell v. Commissioner*, 74 T.C. 578, 581 (1980). For petitioner, this is Saudi Arabia.

An individual, however, shall not be treated as having a tax home in a foreign country for any period for which his "abode" is within the United States. I.R.C. § 911(d)(3); *see also Harrington v. Commissioner*, 93 T.C. 297, 307 (1989). Temporary presence of the individual in the United States does not necessarily mean that the individual's abode is in the United States. Treas. Reg. § 1.911-2(b). Moreover, "[m]aintenance of a dwelling in the United States by an individual, whether or not that dwelling is used by the individual's spouse and dependents, does not necessarily mean that the individual's abode is in the United States." *Id.*

In *Bujol v. Commissioner*, T.C. Memo. 1987-230, 1987 Tax Ct. Memo LEXIS 234, at *8–9, *aff'd without published opinion*, 842 F.2d 328 (5th Cir. 1988), we considered the meaning of the word "abode" as used in section 911(d)(3) and stated:

> "Abode" has been variously defined as one's home, habitation, residence, domicile, or place of dwelling. Black's Law Dictionary 7 (5th ed. 1979). While an exact definition of "abode" depends upon the context in which the word is used, it clearly does not mean one's principal place of business. Thus, "abode" has a domestic rather than vocational meaning, and stands in contrast to "tax home" as defined for purposes of section 162(a)(2).

To determine a taxpayer's "abode" for a particular period under section 911(d)(3), we compare and contrast "the taxpayer's domestic ties (i.e.,

his familial, economic, and personal ties) to the United States with his ties to the foreign country in which he claims a tax home." *Haskins v. Commissioner*, 820 F. App'x 994, 995 (11th Cir. 2020) (quoting *Harrington*, 93 T.C. at 307–08), *aff'g* T.C. Memo. 2019-87. A taxpayer posted abroad will invariably have some connections with the foreign country in which he works, but when his ties to the United States are stronger, we have held that his "abode" remains in the United States. *See, e.g.*, *Harrington*, 93 T.C. at 309. Considerations for determining the taxpayer's "abode" include property ownership, community involvement, banking activity, recreational activities, the amount of time the taxpayer spent in each location, and the residence of the taxpayer's family. *See id.*

On the basis of the record before us, we conclude that petitioner had stronger domestic ties to Saudi Arabia than he did to the United States in 2016. His community involvement and recreational activities in Saudi Arabia were relatively significant in comparison with those in the United States, and overall, most of his time had been spent in Saudi Arabia. He dedicated much of his free time in Saudi Arabia to serving as the president of a local social club and organizing charitable events such as food and clothing drives in order to benefit the local community. These charitable events benefited local orphanages, homeless shelters, and members of the local community who worked at the compound. He also spent his free time frequenting local grocery stores and restaurants, using the recreational amenities at the residence, and traveling with other contractors from the compound to nearby foreign countries. He had obtained an *Iqama*, which is a Saudi Arabian resident alien card or visa indicating proof of his legal residence; Saudi Arabian medical insurance; and a Saudi Arabian driver's license. He also did not seek work in any country outside of Saudi Arabia. Taken together, these facts evidence an effort to create a domestic life for himself in Saudi Arabia. *See, e.g.*, *Linde v. Commissioner*, T.C. Memo. 2017-180.

Meanwhile, petitioner's family and personal ties to the United States were limited. Petitioner divorced in 2006 and did not remarry. He had family in the United States—his sisters, brother, mother, and daughter—but only visited his daughter for two weeks over the summer and his mother for one week during the winter holidays. Also of note, he did not visit any doctors, dentists, or other medical providers while he was present in the United States Although he owned a single home in Georgia and chose not to rent it out, it was used as a place for his daughter to live while she did not own a home of her own. He was not

primarily responsible for providing any other living assistance, financial or otherwise, to any of his immediate relatives.

Some of the facts respondent points to as adverse to petitioner appear neutral to us. Petitioner maintained a U.S. driver's license throughout 2016 but also obtained a Saudi Arabian driver's license as a requirement of his employment; and we presume that he used his Saudi Arabian license far more frequently considering the significant amount of time he spent there compared with the time he spent in the United States. He maintained a U.S. bank account but that was an additional requirement of his employment which served as the sole medium to receive his salary payments. He retained his U.S. citizenship but also obtained an *Iqama*, which indicated proof of his legal residence and desire to stay in Saudi Arabia. He lived in housing provided by his employer and therefore did not own property in Saudi Arabia, but he was accustomed to such housing accommodation for most of his military career and it was bargained for as part of his employment contract. He had no need to seek out his own housing arrangements. He retained medical insurance with a U.S. provider that supports retired members of the military, but he also obtained medical insurance in Saudi Arabia. Lastly, he did not pay tax to Saudi Arabia but that can be attributed to the fact that Saudi Arabia has a VAT from which earned income is generally excepted.

Moreover, while it is well settled that each tax year stands by itself and "must be separately considered," *see Pekar v. Commissioner*, 113 T.C. 158, 166 (1999), respondent emphasizes that petitioner consistently referred to the United States as "home" and always intended to return there. Consequently, we should find that his tax home was not in Saudi Arabia because his abode remained in the United States. However, three additional facts support the conclusion that petitioner's domestic ties in Saudi Arabia continue to be stronger than those in the United States: (1) he continues to be employed in Saudi Arabia; (2) his employer recently described him as "highly valued," his performance as "excellent," and his role as "essential"; and (3) he has a fiance in Saudi Arabia, who has been in Saudi Arabia for 30 years and is the manager of a local beauty salon. On the basis of foregoing, we conclude that petitioner's abode was in Saudi Arabia in 2016; therefore, he is entitled to exclude his foreign earned income up to the limitations set forth in section 911(b)(2).

II.     *Additions to Tax Under Section 6651(a)(1) and (2)*

Respondent determined that petitioner is liable for failure-to-file and failure-to-pay additions to tax under section 6651(a)(1) and (2), respectively.  As discussed above, foreign earned income is income for services performed by a taxpayer outside the United States.  *See* I.R.C. § 911(b)(1)(A).  This definition specifically excludes pension income. I.R.C.  § 911(b)(1)(B)(i);  Treas.  Reg.  §  1.911-3(c)(2).  Therefore, petitioner's pension income, along with the amount left over after accounting for limitations on his foreign earned income exclusion, both remain taxable and subject to additions to tax.

Respondent bears the burden of production with respect to petitioner's liability for the additions to tax.  *See* I.R.C. § 7491(c).  In order to meet that burden respondent must offer sufficient evidence to indicate that it is appropriate to impose the additions.  *See Higbee*, 116 T.C. at 446.  Once respondent meets his burden of production, petitioner must come forward with persuasive evidence that respondent's determination is incorrect or that he has an affirmative defense.  *Id.* at 446–47.

Section 6651(a)(1) provides for an addition to tax in the event a taxpayer fails to file a timely return (determined with regard to any extension of time for filing) unless it is shown that such failure is due to reasonable cause and not due to willful neglect.  The amount of the addition is equal to 5% of the amount required to be shown as tax on the delinquent return for each month or fraction thereof during which the return remains delinquent, up to a maximum addition of 25% for returns more than four months delinquent.

Section 6651(a)(2) provides for an addition to tax for failure to timely pay "the amount shown as tax on any return specified in paragraph (1)" unless the taxpayer establishes that the failure was due to reasonable cause and not willful neglect.  The addition is calculated as 0.5% of the amount shown as tax on the return but not paid, with an additional 0.5% for each month or fraction thereof during which the failure to pay continues, up to a maximum of 25%.  The amount of the addition to tax under section 6651(a)(2) reduces the addition to tax under section 6651(a)(1) for any month for which both additions to tax apply.  *See* I.R.C. § 6651(c)(1).  The addition applies only when an amount of tax is shown on a return.  *See Cabirac v. Commissioner*, 120 T.C. 163, 170 (2003), *aff'd per curiam*, 2004 WL 7318960 (3d Cir. Feb. 10, 2004).  A substitute for return made by the Secretary under section

6020(b) is treated as "the return filed by the taxpayer for purposes of determining the amount of the addition" under section 6651(a)(2). I.R.C. § 6651(g)(2). For these purposes, a substitute for return "must be subscribed, it must contain sufficient information from which to compute the taxpayer's tax liability, and the return form and any attachments must purport to be a 'return'." *Spurlock v. Commissioner*, T.C. Memo. 2003-124, 2003 WL 1987156, at \*10; *see Cabirac*, 120 T.C. at 170–71.

Petitioner's 2016 return was due to be filed on or before April 15, 2017, in the absence of any extensions. *See* I.R.C. §§ 6072(a), 6081(a). The parties stipulated that petitioner did not file a return for 2016. Further, respondent prepared a substitute for return pursuant to section 6020(b) for 2016 showing tax due of $28,932, plus additions to tax. The foregoing satisfies respondent's burden of production under section 7491(c) and establishes petitioner's liability for the section 6651(a)(1) and (2) additions to tax unless petitioner can establish reasonable cause for his failure to timely file or pay. *See Higbee*, 116 T.C. at 446. Petitioner does not argue, nor does the record show, that he had a meaningful defense to the imposition of the additions to tax. Therefore, we sustain respondent's imposition of the additions to tax under section 6651(a)(1) and (2), with the "amount required to be shown as tax on [the] return" computed in a manner consistent with petitioner's taxable income as redetermined herein.

We have considered all of the parties' arguments, and, to the extent not addressed above, we conclude that they are moot, irrelevant, or without merit.

To reflect the foregoing,

*Decision will be entered under Rule 155.*